# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **DONELL J. BLOUNT SR.,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:04cv00429 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **J. FLEMING, et al.,** | ) | |
| Defendants | ) | By: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

Plaintiff, Donell J. Blount Sr., an inmate held at Red Onion State Prison near Pound, Virginia, ("Red Onion"), filed this action pro se for monetary damages and other relief[1] under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, against various Virginia Department of Corrections, ("DOC"), officers and officials. Jurisdiction over this matter is based upon 28 U.S.C. §§ 1331 and 1343. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B) to conduct an evidentiary hearing and to make a recommended disposition.

The undersigned held an evidentiary hearing in this case on April 10 and May 11, 2006. Based on the evidence presented, the undersigned recommends that the court find that Blount exhausted his administrative remedies with regard to his excessive force claim based on an alleged May 5, 2004, assault and the denial of his initial request to receive the common fare diet. However, I further recommend that

---

[1]Blount filed a motion seeking a temporary restraining order/preliminary injunction, requesting that he be placed on the common fare diet three times daily. (Docket Item No. 7). By order entered December 17, 2004, this motion was denied by the court. (Docket Item No. 12).

Case 7:04-cv-00429-JCT-PMS   Document 124   Filed 06/29/06   Page 1 of 35   Pageid#: 620

the court find that Blount failed to exhaust his administrative remedies prior to filing this case regarding his subsequent request to receive the common fare diet.[2]  I also recommend that the court find in favor of defendants Jeremy Fleming and Tony Vanover on the excessive force claim.  Finally, I recommend that the court find that defendant Duncan Mills is not subject to suit in his official capacity for monetary damages and is entitled to good faith qualified immunity on Blount's free exercise claims brought against him in his individual capacity under both the First Amendment and RLUIPA .

## I.  Procedural History

The evidence before the court shows that Blount was an inmate at Red Onion at all times relevant to this case.  Blount's original complaint included five groups of claims.  The court previously dismissed two groups of claims, and Blount voluntarily dismissed a third claim.  The only claims remaining in this case are Blount's excessive force claim and his claims that his constitutional and statutory rights to the free exercise of religion under the First Amendment and under RLUIPA were violated when he was denied the common fare diet.  After addressing the exhaustion issue, I will address each of these claims in turn.

---

[2]I note that Blount did not allege in his complaint or in his amended complaint that defendant Duncan Mills violated his right to the free exercise of his religion under either the First Amendment or under RLUIPA by deferring for six months his subsequent request to receive the common fare diet.  Nonetheless, extensive testimony was received at trial regarding Blount's subsequent request and six-month deferral.  That being the case, I find it necessary to address this point in this Report and Recommendation.

Case 7:04-cv-00429-JCT-PMS   Document 124   Filed 06/29/06   Page 2 of 35   Pageid#: 621

## II. Facts and Analysis

### A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act, ("PLRA"), Pub. L. No 104-134, amended 42 U.S.C. § 1997e making it mandatory that a prison inmate exhaust his administrative remedies before filing a civil rights suit based on prison conditions. This section states:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C.A. § 1997e(a) (West 2003). This court previously has held that the exhaustion requirement of the PLRA applies to inmates seeking monetary damages, although such damages are not available through a prison grievance system. *See Osbourne v. Deeds*, Civil Action No. 7:99cv00774 (June 8, 2001). The United States Supreme Court also has addressed this issue, holding that under the PLRA, a particular remedy need not be available through the prison's administrative process in order for the PLRA exhaustion requirement to apply. *See Booth v. Churner*, 532 U.S. 731 (2001).

Nonetheless, the PLRA requires only that an inmate must exhaust all "available" administrative remedies. 42 U.S.C.A. § 1997e(a). That being the case, when prison officials prevent an inmate from access to or use of a prison's inmate grievance system, an inmate's failure to exhaust is excused because he had no

-3-

"available" administrative remedy. *See Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) ("a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a)"); *Feliciano v. Goord*, 1998 WL 436358 at *2 (S.D. N.Y. 1998) (dismissal not appropriate where prison officials denied inmate's request for grievance forms and assured him that complaint was not a "grievance matter"); *see also Langford v. Couch*, 50 F. Supp. 2d 544, 547 (E.D. Va. 1999) ("available" defined as "accessible," "within one's reach").

Here, Blount produced evidence at trial that, despite the defendants' contentions that he did not exhaust his administrative remedies with regard to either his excessive force claim or his freedom of religion claims, he did everything that he could to utilize the prison's grievance system in accordance with prison policy. Division Operating Procedure, ("DOP"), 866 requires that, prior to submitting a formal grievance, an inmate must submit an informal complaint. DOP 866 also states that the staff member to whom the informal complaint is directed should respond to the complaint within 15 calendar days. DOP 866 requires an inmate to file a grievance within 30 calendar days from the date of the incident except under certain prescribed circumstances. DOP 866 further requires an inmate to prove that he has sought informal resolution of his complaint by either attaching a copy of his informal complaint to his grievance or by stating the response to his informal complaint on the grievance form. Under DOP 866, an inmate who does not receive a response to his informal complaint should file a formal grievance within 30 days and note that he did not receive any response to his informal complaint.

DOP 866 requires the prison warden or superintendent to respond to an inmate grievance within 30 days. This initial consideration of an inmate's grievance by the

warden or superintendent is referred to as Level I. DOP 866 also provides that an inmate who is dissatisfied with the determination on a grievance at Level I may appeal. The review that occurs on appeal is referred to as Level II. Under DOP 866, all grievances are appealable through at least Level II. Certain specific grievances may be appealed to an additional level, Level III. DOP 866-7.16 also states that the "[e]xpiration of a time limit ... at any stage of the process shall qualify the grievance for appeal to the next level of review."

With regard to his excessive force claim, Blount testified that he completed a Request for Service/Complaint form, ("Informal Complaint"), on May 5, 2004, directed to the attention of the warden, Armentrout, Taylor and Yates,[3] in which he stated that Correctional Officers Fleming and Vanover assaulted him in the stairwell and that Vanover yanked his arm through the tray slot. Blount testified that the informal complaints he sent to the warden, to Armentrout and to Yates were returned to him on May 14, 2004. However, he stated that Taylor never responded to his informal complaint. Blount testified that on May 14, 2004, he filed a grievance regarding the alleged assault on May 5, 2004, among other things. However, Blount stated that he received no response, nor did he receive a notice of receipt of the grievance within 35 days.[4] Thus, Blount stated that he appealed to the Regional Ombudsman on June 18, 2004. Again, Blount testified that he never received a response to this appeal.

---

[3]It is unclear from the evidence presented what positions Armentrout, Taylor and Yates held at Red Onion.

[4]Blount noted that this is five days more than the time allowed for a response under DOP 866.

-5-

Fonnie Taylor, the Inmate Grievance Coordinator at Red Onion, testified that she was responsible for reviewing all inmate grievances. She stated that Blount never filed a grievance relating to the alleged assault by Fleming and Vanover on May 5, 2004. However, Blount submitted into evidence copies of the informal complaints and the grievance filed by him in relation to the alleged May 5, 2004, assault. Thus, it is clear that Blount did, in fact, file the grievance. Blount produced additional evidence at trial to further diminish the credibility of Taylor and the defendants' contentions that he failed to exhaust his administrative remedies. Specifically, Blount testified and produced evidence to show that Red Onion officials returned grievance forms to him that actually belonged to another inmate. Moreover, Blount claims that, when informed of this mistake, officials refused to retrieve the grievance form from Blount and deliver it to the proper inmate. Furthermore, Blount presented evidence that, on more than one occasion, his informal complaints were incorrectly returned to him as "repetitive." For instance, Blount filed an informal complaint on September 21, 2005, in which he noted an earlier request to the warden for the videotape from September 5, 2005, of the C-4 recreation cages. The response Blount received was that this request was repetitive as the warden already had addressed the issue, referencing informal complaint numbers 5368 and 5498. However, as Blount correctly contends, these informal complaints are wholly unrelated to any events that might have occurred on September 5, 2005. Thereafter, Blount filed a grievance, noting this discrepancy and again asking that the videotape be pulled for him to view. However, the Institutional Ombudsman/Grievance Coordinator refused to log Blount's grievance. Thereafter, the Regional Ombudsman upheld that finding.

Also, Blount produced evidence that prison officials had told him that grievances, unrelated to his claims currently before the court, had not been received.

However, copies of those grievances were later returned to him attached to a response from the Regional Ombudsman. Moreover, these grievances were stamped as having been received. Specifically, on August 10, 2005, Blount filed an informal complaint stating that he had filed two grievances on August 4, 2005, regarding his desire to see a dentist. Blount noted that he had received no receipt for those grievances as required under DOP 866. The following day, on August 11, 2005, Blount received a response from F. Stanley, stating that "... according to our records we did not receive your grievance. You may resubmit." On August 11, 2005, Blount completed a grievance, to which he attached the August 4, 2005, informal complaint, noting that he had not received a receipt or a response. He further noted that F. Stanley had responded to his informal complaint by stating that Blount's grievances had never been received. On the August 11, 2005, grievance, Blount further stated that the Grievance Department was "playing games" with his grievances. Blount requested that his grievances be logged/processed and that the Grievance Coordinator "stop playing games with [him]." In response to Blount's August 11, 2005, grievance, F. Taylor, on August 12, 2005, responded to Blount that the grievance did not contain an informal tracking number since it was a request for information and could be resubmitted in complaint form. On August 17, 2005, D. Muncy, with the Office of the Regional Ombudsman, upheld the intake decision. However, when the Regional Ombudsman returned Blount's August 11, 2005, grievance to him, the August 4, 2005, grievances, which allegedly had never been received, also were returned to him. Moreover, these grievances were stamped as having been received by the Grievance Coordinator on August 5, 2005, the day after they were submitted, and six days before F. Stanley informed Blount that the grievances had never been received.

Given all of the evidence presented, I find that Blount did, in fact, exhaust his

administrative remedies with regard to his excessive force claim against Fleming and Vanover.

With regard to Blount's freedom of religion claims, I find that Blount has properly exhausted his administrative remedies with regard to his initial request to receive the common fare diet.[5]  However, I further find that Blount has not exhausted his administrative remedies with regard to his subsequent request to receive the common fare diet.  The evidence shows that on April 22, 2004, Blount filed an informal complaint directed to Taylor, in which he stated that he had submitted a request form on April 18, 2004, to a Mr. Evans[6] to receive the proper paperwork to allow him to be placed on the common fare diet.  Blount stated that he spoke with Evans on April 19, April 20 and April 21, 2004, regarding his need to be placed on the common fare diet.  However, Blount stated that he had received no paperwork. He noted that he was a member of the House of Yahweh and stated that "we obey the dietary laws that are set forth in the Torah or what is commonly referred to as the 'Old Testament.'" Blount stated that it was mandatory that he be placed on the common fare diet.  On April 27, 2004, Taylor responded that Blount's common fare diet application had been received and after being processed, a hearing would be scheduled.  A hearing was held on May 11, 2004, and the Institutional Classification Authority, ("ICA"), recommended approval of the common fare diet.  Thereafter, the review board also recommended approval.  However, on June 2, 2004, Central Classification Services, ("CCS"), denied Blount's application because it found that the

---

[5]The common fare diet is a special diet created to meet several specific religious dietary needs of inmates.

[6]It is unclear from the evidence presented what title Evans held at Red Onion.

-8-

House of Yahweh did not require the religious diet. On June 15, 2004, Blount filed a grievance stating that he had been arbitrarily denied the common fare diet and doing so would be in violation of his First Amendment right to freely exercise his religion. This grievance was returned to Blount the following day, undated and unsigned, but "Informal Procedure. You have not used the informal process to resolve your complaint[]" was circled. Blount then appealed this decision to the Regional Ombudsman on June 16, 2004, stating that his grievance was improperly returned unsigned. Blount requested that the grievance be processed and receipted and that the relief sought be granted. However, he never received a response from the Regional Ombudsman.

Taylor, the Inmate Grievance Coordinator, testified that Blount's June 15, 2004, grievance was never received in her office. However, Blount has submitted into evidence a copy of the grievance form that was returned to him, unsigned and undated, but which stated that "You have not used the informal process to resolve your complaint." Thus, it is clear that Blount's grievance was, in fact, received. Moreover, as outlined above, Blount produced evidence that calls into question the reliability of the DOC's grievance records and procedures followed at Red Onion.

Thus, for all of these reasons, I find that Blount did, in fact, exhaust his administrative remedies with regard to the denial of his initial application to receive the common fare diet. However, Blount has produced no evidence to the court that he exhausted his administrative remedies with regard to his subsequent request to receive the common fare diet. Thus, I find that Blount has not properly exhausted his administrative remedies with regard to this request.

B. *Excessive Force*

Blount argues that Correctional Officers Fleming and Vanover used excessive force against him on May 5, 2004, in violation of the Eighth Amendment's prohibition against the infliction of "cruel and unusual punishment." U.S. CONST. AMEND. VIII. This amendment not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Whitley v. Albers*, 475 U.S. 312, 319 (1986). The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component. *See Williams*, 77 F.3d at 761 (citing *Wilson v. Seiter*, 501 U.S. 294, 302 (1991)).

Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). To meet the objective component in an excessive force case, an inmate must show that he suffered more than de minimis pain or injury. *See Williams*, 77 F.3d at 761(citing *Hudson*, 503 U.S. at 9-10). Since mankind has devised some tortures that leave no lasting physical evidence of injury, the courts have recognized that the objective component can be met by "the pain itself" even if the inmate suffers no "enduring injury." *Williams*, 77 F.3d at 762 (quoting *Norman v. Taylor*, 25 F.3d 1259, 1264 n.4 (4th Cir. 1994) (en banc)). "A prisoner ... asserting malicious and sadistic use of force need not show that such force caused an 'extreme

-10-

deprivation' or 'serious' or 'significant' pain or injury to establish a cause of action. ... All that is necessary is proof of more than *de minimis* pain or injury." *Williams*, 77 F.3d at 761 (citation omitted).

To meet the subjective component in an excessive force case, the inmate must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320-21. The inquiry under the subjective standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. The Supreme Court in *Whitley* set out several factors which should be considered in determining whether prison officials acted maliciously and sadistically. In particular, the court should consider:

1) the need for application of force;
2) the relationship between that need and the amount of force used;
3) the threat reasonably perceived by the responsible officials; and
4) any efforts made to temper the severity of a forceful response.

*Williams*, 77 F.3d at 762 (citing *Whitley*, 475 U.S. at 321).

According to Blount, on the way to recreation on the morning of May 5, 2004, Fleming and Vanover took him to the back stairwell, where they met Correctional Officers Sutherland and Grear. Blount alleges that Sutherland was holding the door to the stairwell open as Blount, Fleming and Vanover entered into the stairwell. He further alleges that Fleming and Vanover shoved him into Sutherland, immediately slammed him onto the floor where they began punching, kicking and kneeing him

Case 7:04-cv-00429-JCT-PMS   Document 124   Filed 06/29/06   Page 11 of 35   Pageid#: 630

while bending back his finger and using racial insults.  Specifically, Blount testified that Fleming was on his left side and Vanover was sitting on his back.  Blount alleges that he was handcuffed and shackled at the time.  He further alleges that, upon returning to his cell, Vanover jerked his arm through the tray slot injuring his forearm. Blount alleges that he sustained injuries as a result of this assault, including a knot on his right cheek, an abrasion to his forearm, an abrasion to his knuckle, an abrasion above his left eye, an injury behind his right ear, bruises to his upper back and abrasions to both ankles.  Blount also contends that he began suffering chest pain as a result of his alleged assault.  After this alleged assault, a nurse was called to Blount's cell, whom Sutherland and Grear accompanied.  Upon seeing blood on Blount's right cheek, the nurse asked him to wash it off.  However, Blount states that he refused to do so until she took a photograph.  However, photographs were not taken of Blount's injuries until May 7, 2004, two days after the alleged assault.  Blount stated that he was experiencing no pain when the nurse was at his cell.  In fact, Blount testified that, at that time, there was nothing wrong with him except for some bruises and a swollen right index finger.  However, he claims that he has since experienced intermittent chest pain, bad headaches and back pain.  He stated that two days following the alleged assault, he  noticed where the handcuffs had sunken into his wrist.  Blount stated that he would not go to the medical triage area on May 5, 2004, with Grear and Sutherland because he did not trust them, as they had failed to protect him from the alleged assault by Fleming and Vanover.

Kyaun Bray also an inmate at Red Onion, was present and testified at Blount's trial.  Bray, who was housed in the cell next to Blount at the time of the alleged assault on May 5, 2004,  testified that Fleming and Vanover pushed Blount into Sutherland, whereupon they entered into the stairwell where Blount was assaulted.  He further

testified that he observed a streak of blood on Blount's face and he heard Blount screaming that officers had just attacked him.

Vanover testified that he and Fleming went to Blount's cell on the morning of May 5, 2004, to take him out for recreation. He testified that as they took Blount to the stairwell on the way to recreation, Blount stated that he was not going outside. Vanover testified that he was on Blount's left side, while Fleming was on his right side. Vanover testified that he and Fleming met Sutherland and Grear at the door to the stairwell, but that nothing happened as Sutherland exited the stairwell into the housing pod. Vanover testified that the door to the stairwell swung open into the stairwell, not into the pod. Vanover further testified that after Blount refused to go outside for recreation, he and Fleming escorted Blount back to his cell without incident. However, Vanover further stated that upon arriving at Blount's cell and as Blount's handcuffs were being removed, Blount swung his right hand around in an attempt to hit him, but hit the edge of the tray slot instead. Vanover stated that he filed an incident report and that he charged Blount with assault, a charge of which Blount was later found guilty. Vanover testified that the pod camera does not capture the inside of the stairwell. He further testified that he had experienced no conflicts with Blount before May 5, 2004. Vanover testified that Blount did not have blood on his face, but that one of the first two knuckles on Blount's right hand was bleeding.

Fleming testified that he and Vanover were responsible for taking inmates to recreation on the morning of May 5, 2004. He stated that they retrieved Blount from his cell and walked him toward the most convenient exit door to the recreation yard. He testified that Sutherland and Grear were near that door, but he was unable to testify as to their exact location. Fleming testified that as Blount was being escorted, he

-13-

asked whether it was raining. Fleming stated that when he informed Blount that it was raining, Blount stated that he did not want to go outside. Therefore, Fleming testified that he and Vanover returned Blount to his cell. Fleming testified that no incident occurred. He stated that when they arrived back at Blount's cell, they followed the normal procedures for removing inmate restraints. He stated that he had hold of the lead strap and that officer Vanover removed Blount's handcuffs. After Vanover removed Blount's handcuffs, he testified that Blount turned to strike Vanover. However, Fleming testified that he was unsure whether Blount was successful in striking Vanover.

R. Sutherland, another correctional officer at Red Onion, also testified at Blount's trial. The testimony and documentary evidence shows that Sutherland and Grear, along with Fleming and Vanover, were responsible for escorting inmates in Blount's pod to recreation on May 5, 2004. Sutherland stated that as he and Grear were reentering the pod through the top tier stairwell, Fleming and Vanover were escorting Blount through the stairwell door to the recreation area. Sutherland stated that he held the door open for them as they went through before letting the door close and going to the next cell to retrieve another inmate for recreation. Sutherland stated that Fleming and Vanover came back into the housing unit with Blount a short time later and returned him to his cell. Sutherland stated that he did not hear any sound of any altercation while Fleming and Vanover were behind the closed stairwell door with Blount. Sutherland further stated that when Fleming, Vanover and Blount came back into the housing unit, there was no indication that there had been any problem, as they were not using any force during the escort and Blount was not being disruptive. Sutherland denied that Blount was pushed into him as he held the stairwell door open, nor did he recall Blount even touching him as he passed through. Sutherland stated

-14-

that Blount was not taken down and assaulted or abused by Fleming and Vanover in his presence. Sutherland testified that, later that day, he and Grear were asked to escort Blount to medical. He stated that they restrained Blount and removed him from his cell, but he refused to go. Upon Blount's refusal, Sutherland and Grear returned Blount to his cell without incident. Sutherland stated that he observed no injuries to Blount's face or person and that Blount did not complain of any injuries and made no statement that he was assaulted or abused by Fleming or Vanover. Sutherland testified that he never observed Fleming and Vanover abuse Blount on May 5, 2004, or any other time.

H. Grear, a correctional officer at Red Onion at the time relevant to Blount's claim, also testified at Blount's trial. Grear testified that he did not recall seeing Fleming and Vanover escorting Blount on May 5, 2004. However, he further testified that he never observed Fleming and Vanover abuse Blount. Grear testified that he recalled going to Blount's cell to take him to medical triage on May 5, 2004, but that Blount stated that he did not want to go. Grear testified that Blount was thereafter returned to his cell. Grear testified that he did not recall seeing any injuries on Blount at that time. He further testified that he did not recall Blount yelling that he had been assaulted.

Del Crowell, a special agent with the Special Investigation Unit of the DOC, also testified at Blount's trial. Crowell testified that, among other things, he is responsible for investigating alleged crimes by correctional staff. Crowell testified that he interviewed Blount approximately two months following the alleged assault of Blount by Fleming and Vanover. Crowell further testified that, at that time, Blount alleged injuries to his ankles, cheek, knuckle and face. As a result of his investigation,

-15-

Crowell determined Blount's claim to be unfounded. In reaching this determination, Crowell testified that he spoke to the officers identified as being involved in the alleged incident, reviewed the videotape from Blount's pod from the morning of May 5, 2004, checked the officers' work schedules and reviewed Blount's medical records. Crowell testified that, in his opinion, the injuries reported to him by Blount as a result of the alleged assault simply were not consistent with his medical records. Specifically, although the nurse's notes indicated a drop of blood on Blount's cheek, he refused to wipe it away so that she could see if there was a cut. Crowell also testified that Sutherland denied that Blount was pushed into him. He further testified that other prison staff said that they saw or heard nothing to support the existence of the incident. Crowell testified that the photographs of Blount's alleged injuries that resulted from the assault showed, in his opinion, nothing more than discolored areas of skin, as opposed to bruises. He further noted that, even assuming that the photographs depicted bruises on Blount's body, they did not support Blount's allegations of severe abuse. Crowell further testified that the photographs of Blount's ankles showing discolorations and areas of peeled skin were merely consistent with the use of leg irons. Crowell testified that the videotape of the pod on the morning of May 5, 2004, showed Blount walking along the tier and going toward the door to go to the recreation yard. He stated, however, that there was no indication of Blount being shoved into another officer. He further stated that the video showed Fleming, Vanover and Blount returning to the pod approximately one minute later and that there was no indication from Blount's behavior on the way back to his cell to suggest that anything had occurred, such as jerking away from the officers.

Tony Adams, an institutional investigator at Red Onion, also testified at Blount's trial. At the time of the alleged incident, Adams was a K-9 officer at Red

Onion. He stated that he took the photographs of Blount's alleged injuries on May 7, 2004. Adams stated that he made no independent determination of the areas of Blount's body to photograph, but that Blount told him the areas he wanted photographed. Adams testified that the tray slots on inmates' cell doors are regularly used to assault correctional officers, and he noted that Blount had a history of doing so, noting at least five incidents during which officers were grabbed by Blount through the tray slot. Adams noted that Blount also had struck a correctional officer in the stomach with a sharpened plastic utensil. Adams testified that Blount informed him that his injuries were the result of an assault. Adams stated that on numerous occasions Blount claimed that he injured his forearm on the tray slot.

Given the evidence presented at trial, I first find that Blount is simply unable to meet the objective component of an excessive force claim. Although Blount alleges that he suffered bruises on his back, an abrasion on his knuckle, an abrasion on his forearm, an abrasion above his left eye, an abrasion behind his right ear and abrasions to his ankles, I find that, even assuming that the photographs taken on May 7, 2004, depicted bruises as opposed to some sort of skin discoloration, and, even assuming that these bruises were the result of an assault by officers Fleming and Vanover, they constitute de minimis injuries at most. On an anatomical figure dated May 5, 2004, Nurse Lester indicated an abrasion of approximately one inch on Blount's right forearm and a reddened area of approximately three inches in the same area on his forearm. In a written note from that same date, Lester noted that upon being called to Blount's cell earlier on May 5, 2004, Blount complained of chest pain. At that time, she noted a superficial abrasion on the right second metacarpal joint approximately one-quarter of an inch in diameter over his knuckle. She further noted a superficial abrasion approximately one inch long on the right posterior proximal

-17-

forearm.  Lester also noted a reddened area of approximately three inches long and one-half an inch wide in the same area.  She indicated an area of dried blood on Blount's right cheek, noting that Blount refused to wash his face so she could check for injury.  However, she noted no bruising or redness on this area of the cheek. Lester noted that Blount removed his shirt and that she examined Blount's upper torso through the cell window.  She noted no redness or bruising.  She noted that Blount was verbally abusive toward both her and the officers.  Lester made a notation in Blount's medical chart that Blount stated "Those bitches beat me up."  Lester noted that Blount refused to leave his cell, making it impossible to obtain an electrocardiogram, ("EKG"), or to further assess his medical condition. She noted that he continued to refuse to wash the dried blood from his face.  At that time, Lester noted that Sergeant Fleming[7] was notified and she returned to Blount's cell, but he again refused to go to triage or to wash the blood from his face.  Lester also completed an Inmate Accident/Injury Report Form, noting that Blount had an abrasion on the second metacarpal joint approximately one-quarter of an inch in diameter and an abrasion on the posterior proximal forearm approximately one inch in length with a reddened area approximately three inches in length below the abrasion.  He was instructed to wash the affected area with soap and water.

In addition to these relatively insignificant findings by Nurse Lester, both Crowell and Adams testified that the abrasions on Blount's ankles were merely consistent with the use of leg irons.  Finally, special agent Crowell testified that the injuries documented in Blount's medical chart, including the photographs taken on May 7, 2004, were not nearly severe enough to support his allegations of a severe

---

[7]Sergeant Fleming is not Jeremy Fleming, one of the named defendants in this case.

assault by Vanover and Fleming. For all of these reasons, I find that Blount is unable to meet the objective component of an excessive force claim. That being the case, I find it unnecessary to discuss the subjective component.

Moreover, in addition to Blount's failure to show that he suffered more than de minimis injuries as a result of the alleged assault by Vanover and Fleming, for the following reasons, I further find that the evidence shows that such an assault simply did not occur. First, I note that Blount's testimony and Bray's testimony directly contradict each other regarding where the alleged assault occurred. Specifically, Blount testified that Sutherland was exiting the stairwell into the pod and that Fleming and Vanover pushed him into Sutherland and then immediately knocked him down. However, Bray testified that Fleming and Vanover pushed Blount into Sutherland and then went further into the stairwell where the alleged assault occurred. Moreover, of the four officers who testified, both Vanover and Fleming testified that the incident simply did not occur, while Sutherland and Grear testified that they neither saw nor heard any such assault. Finally, while the videotape submitted into evidence does not show the inside of the stairwell, it is time stamped in two-second increments. According to the videotape, Fleming and Vanover retrieved Blount from his cell at approximately 8:11:26 a.m. They entered the stairwell door at approximately 8:12:05 a.m. However, Fleming, Vanover and Blount then reentered the pod at approximately 8:13:14 a.m. Thus, the total time between their entering the stairwell and returning into the pod was approximately one minute nine seconds. Blount alleges a rather severe beating that involved being punched, kicked and kneed multiple times and having his finger pulled back while the officers directed racial slurs to him. However, given the time stamped video evidence, I find that there simply was not time for the alleged assault, as testified to by Blount, to have occurred.

-19-

For all of the foregoing reasons, I find that Blount has not met his burden of proof on the excessive force claim, and I recommend that the court find in the defendants' favor on the excessive force claim.

## C. Free Exercise of Religion

Blount also alleges that Duncan Mills, the former chairperson of the Religious Diet Committee and the current Security Manager of CCS, violated his First Amendment right to freely exercise his religion by denying him the common fare diet. In his amended complaint, Blount alleges that Mills also violated his statutory right to the free exercise of his religion under RLUIPA.

I first note that Mills is not subject to a suit in his official capacity for monetary damages. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989). Moreover, both the Supreme Court and the Fourth Circuit have held that state officials sued in their individual capacities are "persons" within the meaning of § 1983 and are not absolutely immune from personal liability under § 1983 solely by virtue of the official nature of their acts. *See Hafer v. Melo*, 502 U.S. 21, 30-31 (1991); *White v. Gregory*, 1 F.3d 267, 269-70 (4th Cir. 1993). However, government officials may have qualified immunity from civil liability for performing discretionary functions only insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For the following reasons, I find that Mills is entitled to good faith qualified immunity on Blount's free exercise claims in his individual capacity.

-20-

Blount claims that he has been a member of the House of Yahweh since June 2003. He further contends that, as a member of the House of Yahweh, he is required to eat a diet consistent with the contents of the common fare diet. The evidence shows that Blount first applied to receive the common fare diet in April 2004. Yvonne Taylor, the Treatment Program Supervisor at Red Onion, testified that she recommended approving Blount's request before forwarding Blount's application to the review board and then to CCS for a final determination. Taylor testified that she did not evaluate whether Blount's beliefs were sincerely held. Taylor testified that she recommended the approval primarily because she was not familiar with the House of Yahweh and felt more comfortable allowing the review board and CCS to make the final determination. The review board also recommended approving Blount's application, but CCS ultimately denied it. In 2005, Blount filed a subsequent application to receive the common fare diet. Again, Taylor recommended to CSS that Blount's request be granted. However, Blount's application was deferred for a period of six months. As previously noted, Blount does not predicate his free exercise claims on the subsequent deferral of his request to receive the common fare diet and, in any event, Blount has failed to exhaust his administrative remedies as regards the subsequent deferment. That being the case, only Blount's free exercise claims regarding the initial denial of his request to receive the common fare diet will be addressed in this Report and Recommendation.

Mills testified that Blount's initial application to receive the common fare diet was denied because, at that time, the House of Yahweh simply was not a religion recognized by the DOC to receive the common fare diet. He further testified, however, that in September or October 2004, the DOC began to recognize the House of Yahweh as a religion approved to receive the common fare diet.

As stated above, it is well-settled that state officials performing discretionary functions are shielded from liability for monetary damages if they can demonstrate that their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. A claim of qualified immunity is evaluated using a three-step analysis. First, the court must determine "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court must "inquire whether at the time of the alleged violation [the right] was clearly established." *Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir. 1990) (Phillips J., concurring). Third, the court must determine whether a "reasonable person in the official's position would have known that his conduct would violate that right." *Collinson*, 895 F.2d at 998 (Phillips J., concurring).

The first inquiry the court must make is whether Blount has alleged a constitutional or statutory right that has been violated. Blount claims that his constitutional right to the free exercise of his religion under the First Amendment has been violated and that his statutory right to the free exercise of religion under RLUIPA has been violated. Courts have held that although inmates lose some constitutional protections upon incarceration, they retain the right to freely worship while in prison. *See McManus v. Bass*, 2006 WL 753017 at *4 (E.D. Va. Mar. 22, 2006) (citing *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987); *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. ..." U.S. CONST. AMEND. I. In order to establish a right under the Free

-22-

Exercise Clause, Blount must make two threshold showings. First, Blount must show that he sincerely holds his religious beliefs. *See Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972). Second, Blount must show that his claims are rooted in religious belief and are not "purely secular." *Yoder*, 406 U.S. at 215-16. Evaluating a statutory violation under RLUIPA involves the same threshold issues as invoked by the Free Exercise Clause for the most part. RLUIPA prohibits a prison institution from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution ..." unless the prison can show that "imposition of the burden ... (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. § 2000cc-1(a) (West 2003). RLUIPA defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.A. § 2000cc-5(7)(A) (West 2003). As under the First Amendment, although prison officials may not question the truth of an inmate's belief, an inmate must demonstrate that the belief is sincerely held in order to establish a protected right under RLUIPA. *See McManus*, 2006 WL 753017 at *5 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Under both the First Amendment and RLUIPA, Blount must show that his right to the free exercise of his religion has been "substantially burdened." *McManus*, 2006 WL 753017 at *5 (quoting *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989); *see also* 42 U.S.C.A. § 2000cc-1(a).

Here, Blount alleges that he has a sincerely held belief in the religion of the House of Yahweh and that his belief requires a kosher diet. Blount alleges that he became a member of the House of Yahweh in 2003. Evidence produced by Blount shows that from August 25, 2003, to December 29, 2004, Blount made contributions

-23-

to the House of Yahweh totaling $34.23.[8]  He also has provided evidence that, as of August 13, 2004, the average monthly balance in his inmate account was $2.84. While these contributions made to the House of Yahweh might not appear at first glance to be very substantial, I submit that for an inmate such as Blount, they were, thereby evidencing Blount's sincerely held belief in his religion.  Moreover, Blount has produced literature regarding the House of Yahweh to the court.  Although no evidence has been produced to show that Blount attends religious services or activities at Red Onion, Mills testified that he was unaware of any such services or activities offered at Red Onion that would be acceptable to members of the House of Yahweh. Thus, there is no evidence before the court that Red Onion provided religious services acceptable to members of the House of Yahweh that Blount simply did not attend. Given this evidence, I find that Blount has sufficiently shown that he possesses a sincerely held belief in the House of Yahweh.  Furthermore, I find that Blount's free exercise of religion has been substantially burdened by the DOC's policy of denying an inmate's request to be placed on the common fare diet based on its determination that members of a particular religion simply are not eligible to receive the diet.

RLUIPA does not define "substantial burden," and the courts that have addressed this issue, the Fourth Circuit not being one, are in disagreement.   The Second Circuit, in *McEachin v. McGuinnis*, 357 F.3d 197, 202 n.4 (2d Cir. 2004), held that a substantial burden exists in a situation where "the state 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" (quoting *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)).  The Fifth Circuit has held that

_____

[8]The record reveals that Blount also attempted to withdraw $5.00 from his inmate account on April 18, 2005, to send to the House of Yahweh, but the withdrawal was refused for insufficient funds.

a government action or regulation creates a substantial burden on "a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins v. Kaspar*, 393 F.3d 559, 569-70 (5th Cir. 2004). The Seventh Circuit has held that a substantial burden results from a regulation that "necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003), *cert. denied*, 541 U.S. 1096 (2004). The Eighth Circuit, quoting *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997), which defined substantial burden in the context of a claim brought under the Religious Freedom Restoration Act, ("RFRA"),[9] defined substantial burden under RLUIPA as follows:

> "[t]o constitute a substantial burden, the government policy or actions: must 'significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.'"

*Murphy v. Mo. Dep't of Corrs.*, 372 F.3d 979, 988 (8th Cir. 2004). The Ninth Circuit has held that a substantial burden on religious exercise must impose a "significantly great restriction or onus upon such exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). Finally, the Eleventh Circuit has held that a substantial

---

[9]The Supreme Court's decision in *City of Boerne v. Flores*, 521 U.S. 507 (1997), invalidated RFRA as it applied to states and localities. Although RFRA continued to apply to the federal government, in September 2000, Congress attempted to reinstate RFRA's protection against government burdens on religious exercise imposed by states and localities by enacting RLUIPA.

burden is one that results from pressure that tends to force an adherent to forgo religious precepts or from pressure that mandates religious conduct. *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004).

Despite this disagreement among the circuits as to the definition of substantial burden, I find that it is clear that the complete denial of the common fare diet to an inmate belonging to a religion that mandates a particular diet accommodated by the common fare diet, and which cannot be accommodated by the regular prison menu supplemented through the purchase of items from the prison commissary, as is the case here, constitutes a substantial burden on that individual's exercise of his religious beliefs. That being the case, the court must next determine whether a reasonable official in Mills's position would have known that denying Blount's request to be placed on the common fare diet violated clearly established law under either RLUIPA or the First Amendment's Free Exercise Clause.

Because the standard of scrutiny under RLUIPA is stricter than under the First Amendment, I will address Blount's claim thereunder first. It is well-settled that in determining whether Blount's rights under RLUIPA were clearly established when Mills acted, the unlawfulness of Mills's conduct must have been addressed by the United States Supreme Court, the Fourth Circuit Court of Appeals or the Virginia Supreme Court. *See Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998). As stated in *Collinson*, the "proper focus for courts is not upon the right at its most general or abstract level, but upon its application to the particular conduct being challenged." 895 F.2d at 998. Therefore, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violated that right." *McManus*, 2006 WL 753017 at *5 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640

-26-

(1987)); *see also Swanson v. Powers*, 937 F.2d 965, 968 (4th Cir. 1991), *cert. denied*, 502 U.S. 1031 (1992).

Here, the crux of Blount's claim is that Mills erred by denying his request to be placed on the common fare diet based on Mills's application of the DOC's policy at the time to deny requests of all members of the House of Yahweh to be placed on the common fare diet because the religion had not been approved by the DOC as one eligible to receive the common fare diet. Although he stated that he doubted that Blount had a sincerely held religious belief, and although Mills expressed concern over Blount's history of institutional infractions, Mills alleges that he denied Blount's initial request solely on the ground that the House of Yahweh was not a religion found by the DOC to be eligible to receive the common fare diet.

Although not specifically argued by Mills, the logical argument is that the DOC's policy of determining whether an inmate's religion requires the consumption of the common fare diet and the DOC's practice of denying requests based solely on a religion's absence from the DOC's approved list arguably serve the compelling government interest of maintaining order and security within the institution and in preserving prison costs and limited resources. It has been held that prison officials do have a compelling interest in maintaining institutional order and security, as well as managing limited prison resources, when faced with questions of inmate religious liberty. *See Hoevenaar v. Lazaroff*, 422 F.3d 366 (6th Cir. 2005); *Benning v. Georgia*, 391 F.3d 1299, 1313 (11th Cir. 2004); *Murphy*, 372 F.3d at 988; *Hamilton v. Schriro*, 74 F.3d 1545, 1555 (8th Cir. 1996) (finding it compelling to maximum security prison to prohibit inmates from having long hair in which contraband and weapons could be concealed); *Harris v. Chapman*, 97 F.3d 499, 503-04 (11th Cir. 1996) (finding the

-27-

state's compelling interest in security and order within prisons especially applies in close custody facilities which contain extremely violent offenders); *Jenkins v. Angelone*, 948 F. Supp. 543, 548 (E.D. Va. 1996) (finding prisons have compelling interest in preserving the health of inmates, maintaining security, managing budgetary constraints and deflecting administrative difficulties) (citing *Ross v. Blackledge*, 477 F.2d 616, 618 (4th Cir. 1973)).

As the court noted in *McManus*, prison officials must regularly assess the sincerity of an inmate's religious beliefs to prevent them from bringing false claims under the guise of religion. *See* 2006 WL 753017 at *6 (citing *Gartrell v. Ashcroft*, 191 F. Supp. 2d 23, 35 (D. D.C. 2002); *Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996); *Reed v. Faulkner*, 842 F.2d 960 (7th Cir. 1988). Also, while courts are "not required to blindly accept any policy justification offered by state officials," their analysis should reflect the requisite deference to the expertise and experience of prison officials. *Hoevenaar*, 422 F.3d at 371. Here, as the district court found in *McManus*, the disparity between the cost of the common fare diet and the regular prison diet justifies a heightened concern over the proliferation of frivolous or secular requests as necessary to maintain order and to preserve limited prison resources. That being the case, I find that it would not be unreasonable for Mills to believe that there is a compelling government interest in restricting the common fare diet to only those who belong to a religion that requires the consumption of such a diet. Therefore, I find that predicating the common fare diet upon a showing that the diet is required by a particular religion is consistent with clearly established law.

Next, the court must determine whether Mills's conduct is lawful under RLUIPA's least restrictive means test. For the reasons that follow, I find that it is.

-28-

I can find no case law, either under RLUIPA or the First Amendment, concerning whether the DOC's policy of denying inmates' requests to be placed on the common fare diet based on its determination that a particular religion is not eligible to receive the diet is the least restrict means of furthering the compelling government interests of maintaining order and security and preserving limited costs and resources. Despite this lack of case law, it has been held that, in the absence of a clearly established procedure, prison officials must formulate an institutional procedure to differentiate between valid and false requests and make case-by-case determinations in furtherance of that procedure. As the *McManus* court noted, courts should not substitute their judgment for that of prison officials given the officials' expertise in evaluating such requests. *See* 2006 WL 753017 at *7 (citing *Cutter*, 544 U.S. at 735; *Hoevenaar*, 422 F.3d at 370 (finding district court improperly substituted its judgment for that of prison officials under the guise of being the least restrictive means where the district court determined that certain inmates possessed a sincerely held belief and did not pose a significant safety risk); *Murphy*, 372 F.3d at 987-88.) However, it also has been held that prison officials' determinations will not satisfy RLUIPA's strict requirements if they are "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations." S. Rep. No 103-111, at 10 (1993).

Under *Collinson*, the court must determine whether Mills's decision to deny Blount's request for the common fare diet violated clearly established law which would be apparent to a reasonable official in his position. *See* 895 F.2d at 998 (Phillips J., concurring). It is not up to the court to determine whether Mills came to the correct conclusion. The Fourth Circuit held that the proper determination must be made on the basis of information "actually possessed at the time by the official ... or

-29-

then readily available to him." *Collinson,* 895 F.2d at 998 (citing *Anderson,* 483 U.S. at 641; *Sevigny v. Dicksey,* 846 F.2d 953, 957 n.5 (4th Cir. 1988)). "The tolera[nce] thus accorded by the objective test to 'good faith' mistakes of judgment traceable to unsettled law, or faulty information, or contextual exigencies, is deliberately designed to give protection to all but the plainly incompetent or those who knowingly violate the law in order to avoid undue inhibition of public officials in the discharge of their discretionary duties." *Collinson*, 895 F.2d at 998 (Phillips J., concurring) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (citations omitted).

In evaluating the lawfulness of Mills's actions, the court should first review the operating procedure upon which he based his determination. However, here, all that has been presented is Mills's testimony that the DOC in fact had such a policy of denying inmates' requests for the common fare diet if their professed religion had not been approved prior to the request to receive the diet. It is unclear whether this is a written policy followed by the DOC, or even what factors go into a determination that a particular religion is eligible or ineligible to receive the common fare diet.[10] In any

---

[10]DOP 611 governs inmates' requests to receive the common fare diet. DOP 611 provides inmates with an initial hearing to explain the religious motivation for the request and also an opportunity to state the reasons in writing on the Common Fare Diet Checklist. The Checklist questions are used to assess the sincerity of an inmate's religion based upon a variety of factors, including how long the inmate has practiced the religion, whether the inmate's name appears on the pass list for religious programs, whether the inmate has previously requested a religious diet, whether the inmate takes any special religious classes, whether the inmate has been observed eating items that may be contradictory to the claimed diet and whether the inmate participates regularly in the services and holidays provided for the religion. The *McManus* court held that due to DOP 611's emphasis on providing inmates an opportunity to establish a sincerely held belief based on a variety of relevant factors, DOP 611 was adequately formulated to balance the prison's interests and inmates' religious rights. *See* 2006 WL 753017 at *8. Thus, the court found that the defendants' reliance on DOP 611 in making their determination was not unlawful. *See McManus,* 2006 WL 753017 at *8. However, as noted above, because Blount's request to receive the common fare diet was rejected outright because the DOC had determined that

-30-

event, I have been unable to locate any case law to support a conclusion that such an outright determination by the DOC that a particular religion is eligible or ineligible to receive the common fare diet is improper. That being the case, I cannot find that Mill's actions in accordance with that policy were unlawful. Furthermore, I cannot find that Mill's determination that Blount was not eligible for the common fare diet was speculative, exaggerated or based upon post-hoc rationalizations. At the time Mills denied Blount's request to the receive the common fare diet, Mills had the following facts before him: (1) Blount claimed to be a member of the House of Yahweh since 2003; (2) the DOC made determinations regarding the eligibility of religions to receive the common fare diet; and (3) the DOC had determined that the House of Yahweh was not eligible to receive the common fare diet. Although the DOC later determined that members of the House of Yahweh were, in fact, eligible to receive the common fare diet, thereby evidencing that their prior determination of ineligibility was in error, it is not for this court to determine the correctness of the decision, but the lawfulness of Mills's actions at the time they were taken.

For the reasons cited above, I find that Mills had no reason to believe that he was acting in an unlawful or unreasonable manner when he denied Blount's initial application to receive the common fare diet. It appears to the undersigned that a reasonable official in Mills's position could have come to the conclusion that Blount was simply ineligible to receive the common fare diet. Furthermore, as the *McManus* court noted, prison officials retain the discretion to guard against the proliferation of frivolous or secular requests and their judgment is entitled to judicial deference where

---

members of the House of Yahweh were not eligible to receive the diet, Mills's actions under DOP 611 are not relevant to the claim currently before the court.

no alternative method of making this necessary determination has been clearly established as the least restrictive means. *See* 2006 WL 753017 at \*9. That being the case, I find that Mills's determination did not clearly violate established law which would be apparent to a reasonable official. Therefore, I find that Mills is entitled to good faith qualified immunity in his individual capacity as to all claims for monetary relief arising from a RLUIPA violation.

I now turn to Blount's free exercise claim arising under the First Amendment. Under the Free Exercise Clause of the First Amendment, where a prisoner establishes a threshold constitutional right that has been infringed, the validity of the procedure or officials' determination that infringes that right is valid if "it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see O'Lone*, 482 U.S. at 349. Because the court already has determined that Mills's conduct was not in violation of clearly established law under RLUIPA's strict scrutiny standard, it is a foregone conclusion that his conduct did not violate the First Amendment's reasonableness standard. Therefore, I recommend that the court find that Mills also is entitled to good faith qualified immunity in his individual capacity for monetary damages arising from a violation of the Free Exercise Clause of the First Amendment.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.      Blount has exhausted his administrative remedies with regard to

-32-

his excessive force claim;

2.    Blount has exhausted his administrative remedies with regard to his freedom of religion claims arising from the initial denial of his request to receive the common fare diet;

3.    Blount has failed to exhaust his administrative remedies with regard to any freedom of religion claim arising from the deferment of his subsequent request to receive the common fare diet;

4.    Blount was not assaulted by Fleming and Vanover on May 5, 2004;

5.    Even assuming that Blount was assaulted by Fleming and Vanover on May 5, 2004, the injuries he sustained were de minimis at most;

6.    Mills is not subject to a suit in his official capacity for monetary damages;

7.    Blount has alleged a constitutional and a statutory violation of his right to freely exercise his religion;

8.    Blount has established a sincerely held belief in the House of Yahweh;

9.    Blount has shown that the DOC's policy of denying an inmate's request to receive the common fare diet, based on its determination that the inmate's professed religion is not eligible to receive the common fare diet, substantially burdened Blount's ability to freely exercise his religion;

10.   A reasonable official in Mills's position would not have known that denying Blount's request to receive the common fare diet based on the DOC's policy, as outlined above, violated clearly established law under either RLUIPA or the First Amendment; and

-33-

11.     Mills is entitled to good faith qualified immunity on Blount's free
        exercise claims brought against Mills in his individual capacity.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court find in the defendants' favor on Blount's excessive force claim. I further recommend that the court find that defendant Mills is not subject to suit in his official capacity for monetary damages and that he is entitled to good faith qualified immunity in his individual capacity on Blount's claims that he violated Blount's right to freely exercise his religion under both the First Amendment and RLUIPA.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 1993 & Supp. 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the

Case 7:04-cv-00429-JCT-PMS   Document 124   Filed 06/29/06   Page 34 of 35   Pageid#: 653

Honorable Glen E. Conrad, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 29th day of June 2006.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE