CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 18 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DONELL J. BLOUNT, SR., <br> Plaintiff, | Civil Action No. 7:04CV00429 |
| v. | **MEMORANDUM OPINION** |
| GENE M. JOHNSON, et al., <br> Defendants. | By: Hon. Glen E. Conrad <br> United States District Judge |

Donell J. Blount, Sr., a Virginia inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5. By order entered March 6, 2006, the court denied the defendants' motion for summary judgment on the merits of the plaintiff's remaining claims, and referred the case to United States Magistrate Judge Pamela Meade Sargent for appropriate proceedings, pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate judge held an evidentiary hearing on April 7, 2006 and May 11, 2006. The case is presently before the court for review of the Magistrate Judge's Report and Recommendation.

## Procedural Background

Blount is incarcerated at Red Onion State Prison in Pound, Virginia. His original complaint included five groups of claims. The court previously dismissed two groups of claims, and Blount voluntarily dismissed a third claim.

In the first of his two remaining groups of claims, Blount alleges that Correctional Officers J. Fleming and T. Vanover used excessive force against him on May 5, 2004. Specifically, Blount alleges that Fleming and Vanover assaulted him in the stairwell while escorting him to recreation, and that Vanover jerked his arm through the tray slot, upon returning him to his cell.

Additionally, Blount alleges that Correctional Officers H. Grear and R. Sutherland failed to protect him from being assaulted in the stairwell.

In his second group of claims, Blount alleges that Duncan Mills, the former chairman of the Virginia Department of Corrections' Religious Diet Committee, violated his rights under the First Amendment and RLUIPA by denying his initial application for the common fare diet. Blount's initial application was denied on the basis that his "stated religious affiliation," the House of Yahweh, "does not require the diet."[1] (Docket No. 4, Ex. No. 8). Blount seeks only monetary damages.

The defendants previously moved for summary judgment on the basis that Blount failed to exhaust his administrative remedies with respect to his excessive force claim and his common fare diet claims. The court ultimately denied the motion, concluding that a genuine issue of material fact remained as to whether the exhaustion requirement was met. The defendants then moved for summary judgment on the merits of Blount's remaining claims. The court denied that motion on March 6, 2006, and referred the case to the magistrate judge.

The magistrate judge has now issued a Report and Recommendation, which includes the following proposed findings of fact and conclusions of law:

---

[1] Subsequent to the denial of Blount's initial application for the diet and the filing of the instant action, the Virginia Department of Corrections began to recognize the House of Yahweh as a religion requiring the common fare diet. Blount reapplied for the diet in the fall of 2005. Although prison officials recommended granting Blount's subsequent application, the Religious Diet Committee deferred ruling on the application for six months, so that Blount could demonstrate "appropriate" or "less violent" institutional behavior. (5/11/2006 Tr. at 248). The Committee advised Blount that he could reapply for the diet at the end of the six-month period.

Blount did not amend his complaint to include any claims related to the deferment of his subsequent application for the common fare diet. However, because the magistrate judge heard extensive testimony regarding Blount's subsequent application, she found it necessary to address the issue in her Report and Recommendation.

2

1.  Blount has exhausted his administrative remedies with regard to his excessive force claim;

2.  Blount has exhausted his administrative remedies with regard to his freedom of religion claims arising from the denial of his initial application to receive the common fare diet;

3.  Blount has failed to exhaust his administrative remedies with regard to any freedom of religion claims arising from the deferment of his subsequent request to receive the common fare diet;

4.  Blount was not assaulted by Fleming and Vanover on May 5, 2004;

5.  Even assuming that Blount was assaulted by Fleming and Vanover on May 5, 2004, the injuries he sustained were de minimis at most;

6.  Mills is not subject to suit in his official capacity for monetary damages;

7.  Blount has alleged a constitutional and a statutory violation of his right to freely exercise his religion;

8.  Blount has established that he had a sincerely held belief in the House of Yahweh at the time he filed his initial application to receive the common fare diet;

9.  Blount has shown that the DOC's policy of denying an inmate's request to receive the common fare diet, based on its determination that the inmate's professed religion is not eligible to receive the common fare diet, substantially burdened Blount's ability to freely exercise his religion;

10. A reasonable official in Mills' position would not have known that denying Blount's request to receive the common fare diet based on the DOC's policy, as outlined above, violated clearly established law under either RLUIPA or the First Amendment; and

11. Mills is entitled to good faith qualified immunity on Blount's free exercise claims brought against Mills in his individual capacity.

## Standard of Review

The magistrate judge makes only a recommendation to this court. Mathews v. Weber, 423 U.S. 261, 270 (1976). The magistrate judge's report has no presumptive weight, and this court retains the responsibility to make a final determination. Id. at 270-271. Consequently, the court

3

"may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The court "may also receive further evidence or recommit the matter to the magistrate judge with instructions." Id.

A district court is only required to review de novo those portions of the report to which specific objections have been made. The court need not conduct a de novo review "when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate judge's report." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982).

In this case, specific objections have been filed by Blount and Duncan Mills. Blount objects to the magistrate judge's findings of fact and conclusions of law with respect to his excessive force claim. Additionally, both Blount and Mills object to the magistrate judge's findings of fact and conclusions of law with respect to the common fare diet claims against Mills in his individual capacity.[2]

## Discussion

A. <u>Excessive Force</u>

As previously stated, Blount alleges that Fleming and Vanover used excessive force against him on May 5, 2004, in violation of the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment. To prevail on an excessive force claim, an inmate must establish two elements: (1) that the prison officials acted with a sufficiently culpable state of mind, and (2) that the harm inflicted on the inmate was sufficiently serious. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). With respect to the objective element, an inmate "need not show that the force used caused an 'extreme deprivation' or 'serious' or 'significant' pain or injury to establish a cause

---

[2] Neither the plaintiff nor the defendants have objected to the magistrate judge's findings of fact and conclusions of law with respect to the exhaustion of administrative remedies or the claims against Mills in his official capacity. Thus, the court will adopt those findings of fact and conclusions of law.

4

of action." Id. (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)). However, absent the most extraordinary circumstances, an inmate must provide proof of more than de minimis injury. Norman v. Taylor, 25 F.3d 1259, 1263 (4th Cir. 1994).[3]

During the evidentiary hearing, Blount testified that Fleming and Vanover retrieved him from his cell on the morning of May 5, 2004, and told him that they were going to escort him to recreation. (4/7/06 Tr. at 138-139). While walking toward the stairwell, Blount, Fleming, and Vanover met Grear and Sutherland. Blount testified that while Sutherland held the door to the stairwell open, Fleming and Vanover "shoved [him] up against Officer Sutherland." (Tr. at 140). Blount further testified that as soon as the officers "slammed him up against [Sutherland]," they "immediately" slammed him down on the floor in the stairwell. (Tr. at 140). At that point, Fleming and Vanover repeatedly elbowed Blount in the head, kneed him in the back, and punched him in the back. (Tr. at 140). Additionally, while sitting on Blount's back, Vanover bent his finger until it felt as if it would break. (Tr. at 141). Blount further testified that upon returning to his cell, Vanover jerked his arm through the tray slot. (Tr. at 141).

Blount testified that as a result of the officers' actions, he had a knot on his right cheek, an abrasion on one of his knuckles, and a bruise and abrasion on his right forearm. (4/7/06 Tr. at 142-143). Blount also testified that he began to suffer from chest pain and a headache. (Tr. at 143).

After the alleged incident, Nurse Lester was called to Blount's cell. Upon seeing blood on Blount's cheek, the nursed asked him to wash off the blood. (4/7/06 Tr. at 143). However, Blount

---

[3] In Norman, the Fourth Circuit recognized that "there may be highly unusual circumstances in which a particular application of force will cause relatively little, or perhaps no, enduring injury, but nonetheless will result in the impermissible infliction of pain." Norman, 25 F.3d at 1263. In such circumstances, "the force will be 'of a sort repugnant to the conscience of mankind,' and thus expressly outside the de minimis force exception, or the pain itself will be such that it can properly be said to constitute more than de minimis injury." Id. (quoting Hudson, 503 U.S. at 8).

5

Case 7:04-cv-00429-JCT-PMS   Document 142   Filed 12/18/06   Page 5 of 20   Pageid#: 1337

testified that he refused to wash off the blood until his face could be photographed. (Tr. at 143). Blount then refused to go the medical triage area with Grear and Sutherland, because they allegedly failed to protect him from Vanover and Fleming. (Tr. at 144-145).

Blount testified that on the evening of May 5, 2004, he filed an emergency grievance complaining of a headache, chest pain, and back pain. (4/7/06 Tr. at 147). When nurses arrived to examine him, Blount advised them that he was no longer experiencing chest pain. (Tr. at 148). The nurses advised him to place a sick-call request if he needed to be seen for back pain. (Tr. at 148). Blount testified that he did not think that there was anything "drastically wrong" with him other than some bruises, back pain, and a swollen finger. (Tr. at 148-149). Blount testified that the back pain kept him from sleeping on his back for two weeks. (Tr. at 148). Although Blount also testified he had marks on his right wrist and ankles from where the handcuffs and shackles had "bitten down" on his skin, Blount acknowledged that these "injuries" were "not severe." (Tr. at 149).

Kyaun Bray, another inmate at Red Onion, appeared at the evidentiary hearing. Bray, who was housed in the cell next to Blount on May 5, 2004, testified that Fleming and Vanover pushed Sutherland into Blount, and that they then pushed Blount through the entry to the stairwell. (4/7/06 Tr. at 193). Upon being brought from the stairwell, Bray observed a "little scrape" on Blount's face. (Tr. at 194). Bray also heard Blount screaming that officers had just attacked him. (Tr. at 194).

Vanover testified that he and Fleming went to Blount's cell on the morning of May 5, 2004 to take him out for recreation. (4/7/06 Tr. at 288). After the officers removed Blount from his cell and began leading him down the stairwell, Blount stated that he did not want to go outside. (Tr. at 291). Therefore, the officers turned around and led him back to his cell without incident. (Tr. at 294, 300). Once Blount was in his cell and the cell's door was closed, the officers began removing

his handcuffs through the tray slot. (Tr. at 295). After Blount's handcuffs were removed, Blount swung his right hand through the tray slot in an attempt to hit Vanover. (Tr. at 297). However, Blount hit the edge of the tray slot instead. (Tr. at 297). Vanover filed an incident report regarding Blount's conduct, and Blount was ultimately convicted of assault. (Tr. at 298). Vanover testified that Blount did not have any blood on his face, but that one of the knuckles on his right hand was bleeding from where he hit the tray slot. (Tr. at 339-340).

Fleming testified that he and Vanover were responsible for escorting Blount to recreation on the morning of May 5, 2006. (5/11/06 Tr. at 6). Fleming stated that they retrieved Blount from his cell and walked him toward the exit door. (Tr. at 9). Fleming recalled seeing Sutherland and Grear near the exit door, but he was unable to identify their exact location. (Tr. at 9). Fleming testified that as they were escorting Blount down the stairs, he asked whether it was raining. (Tr. at 11). When Fleming advised him that it was raining, Blount told the officers that he did not want to go outside in the rain. (Tr. at 11). Therefore, the officers turned around and took him back to his cell without incident. (Tr. at 11). After Blount was placed in his cell and his handcuffs were removed, Blount attempted to strike Vanover through the tray slot. (Tr. at 12). Fleming could not recall whether Blount's attempt was successful. (Tr. at 12).

Sutherland testified that he and Grear were also responsible for escorting inmates to recreation on May 5, 2004. (5/11/06 Tr. at 45, 49). Sutherland testified that as he and Grear were about to enter Blount's pod and obtain another inmate, they met Blount, Fleming, and Vanover. (Tr. at 46). Sutherland held the door open for them to walk into the stairwell. (Tr. at 46). Sutherland testified that he did not see anyone physically assault Blount on that date. (Tr. at 47-48). At some point later, Sutherland and Grear were asked to take Blount to see the nurse. (Tr. at 47). However, Blount refused to go to the triage room. (Tr. at 47). Therefore, he was returned to his cell without

7

incident. (Tr. at 47). Sutherland testified that he did not recall observing any injuries on Blount's hands or face. (Tr. at 56).

Grear testified that he was responsible for taking inmates to recreation on May 5, 2004. (5/11/06 Tr. at 66). While Grear had no specific recollection of seeing Fleming and Vanover with Blount on that particular date, he testified that he did not observe the officers abuse Blount. (Tr. at 66-67). Grear further testified that he recalled going to Blount's cell to take him to medical triage on May 5, 2004, but that Blount stated that he did not want to go. (Tr. at 68). Thus, the officers returned Blount to his cell. (Tr. at 69). Grear testified that he did not observe any injuries on Blount. (Tr. at 72).

Del Crowell, an agent with the Special Investigation Unit of the Virginia Department of Corrections, testified that he interviewed Blount regarding the May 5, 2004 incident approximately two months after it allegedly occurred. (5/11/06 Tr. at 82, 95). Crowell testified that, at that time, Blount alleged injuries to his ankles, one of his cheeks, the knuckle on one of his hands, and an area on his face. (Tr. at 84). Crowell ultimately determined that Blount's claim was unfounded. (Tr. at 87). In reaching this determination, Crowell testified that he spoke with the officers allegedly involved with the incident, reviewed the videotape from Blount's pod, and reviewed Blount's medical records. (Tr. at 87). According to Crowell, Blount's medical records were not consistent with the injuries Blount described. (Tr. at 85). Although the records indicated that Blount had a drop of blood on one of his cheeks, Blount refused to wipe the blood away so that the nurse could examine the area. (Tr. at 85). Crowell testified that the photographs of Blount's body did not reveal any injuries that would indicate that Blount had been assaulted. (Tr. at 87-88). Instead, Crowell testified that the areas of discoloration shown around Blount's ankles were consistent with wearing

leg irons, and that the other areas of discoloration on Blount's back and face looked more like birthmarks or pimples than bruises. (Tr. at 87, 114-116).

Tony Adams, an institutional investigator at Red Onion, testified that he took photographs of Blount's alleged injuries on May 7, 2004. (5/11/2006 Tr. at 151-152). Adams stated that he did not make an independent determination as to what areas of Blount's body to photograph. (Tr. at 152). Instead, Blount told him the areas that he wanted photographed. (Tr. at 152). Adams testified that there were no blemishes or marks that struck him as being remarkable, and that the alleged bruises appeared to be areas of mere discoloration. (Tr. at 153). Adams also testified that the marks on Blount's ankles were consistent with the use of leg irons. (Tr. at 154). Adams testified that the tray slots on cell doors are regularly used to assault correctional officers, and that Blount has a history of using his slot for that purpose. (Tr. at 155-156). Adams further testified that Blount had, on multiple occasions, claimed that officers had shut his hands in the tray slot. (Tr. at 172).

Blount's medical records from May 5, 2004 were submitted as exhibits. On an anatomical figure dated May 5, 2004, Nurse Lester noted a one-inch abrasion and a three-inch area of redness on Blount's right forearm. In a written note from that same date, Lester stated that Blount had a small abrasion of approximately one-fourth of an inch in diameter on one of his right knuckles, in addition to the abrasion and redness on his forearm. Lester also noted that Blount had an area of dried blood on his right cheek, but that Blount refused to wash his face so that she could check the area for injury. Nonetheless, Lester noted that she saw no bruising or redness. Lester indicated that Blount was verbally abusive toward her and the officers, and that Blount refused to leave his cell, making it impossible to further assess his medical condition or obtain an electrocardiogram. That same day, Lester completed an Inmate Accident/Injury Report Form, on which she noted the

9

aforementioned abrasions and redness. Blount was instructed to wash the areas with soap and water.

Based on the aforementioned evidence, the magistrate judge determined that Blount failed to meet his burden of proof on the excessive force claim. First, the magistrate judge determined that Blount failed to satisfy the objective component of the test for excessive force. The magistrate judge emphasized that even assuming that the photographs of Blount's body depicted bruises, as opposed to areas of skin discoloration, and even assuming that the bruises were the result of actions by Fleming and Vanover, they were, at most, de minimis injuries. Additionally, the magistrate judge found that the alleged assault in the stairwell simply did not occur.

Blount has objected to the magistrate judge's finding that he failed to establish more than de minimis injuries. However, based on the court's de novo review of the record, the court agrees with the magistrate judge. As previously stated, Blount's medical records indicate that he had a one-inch abrasion and a three-inch area of redness on his right forearm. Additionally, Blount had a small, superficial abrasion on one of his right knuckles. Although Nurse Lester also observed a spot of dried blood on Blount's right cheek, Blount refused to wash the area so that the nurse could properly examine it. Nonetheless, Nurse Lester did not observe any bruising or redness on Blount's cheek. In addition to these relatively insignificant findings from the nurse, both Special Agent Crowell and Investigator Adams testified that the photographs of Blount's body, which were taken two days after the incident, did not support his allegations of excessive force. Even assuming that the photographs showed bruises on Blount's body, as opposed to areas of skin discoloration, such injuries were, at most, de minimis. While Blount now emphasizes that he suffered "more than de minimis pain" as a result of the incident, he does not dispute that only minimal medical treatment was required or prescribed for his injuries. Moreover, Blount testified that he was no longer experiencing chest pain

10

by the time the nurse returned to his cell on the evening of May 5, 2004, and that his back pain dissipated within two weeks of the alleged incident. Given such evidence, the court concludes that Blount failed to establish that he suffered more than de minimis injuries as a result of the officers' actions. Consequently the court will find in favor of Fleming and Vanover with respect to Blount's excessive force claim.[4]

B.  Common Fare Diet Claims

In his final group of claims, Blount alleges that Duncan Mills violated his rights under the First Amendment and RLUIPA by denying his initial application for the common fare diet. Blount first applied for the diet in April of 2004. On his application, Blount indicated that he had been a member of the House of Yahweh since June of 2003, and that the religion's laws required him to consume a kosher diet.[5] Following a hearing in May of 2004, Yvonne Taylor, a treatment program supervisor at Red Onion, recommended approving Blount's application for the common fare diet, as did Red Onion's former warden, D.A. Braxton. However, the application was ultimately denied by the Department of Corrections' Religious Diet Committee on the basis that the House of Yahweh

---

[4]Having found that Blount failed to establish more than de minimis injuries, the court finds it unnecessary to determine whether the alleged assault in the stairwell or the cell actually occurred. Thus, the court declines to adopt that portion of the Report and Recommendation in which the magistrate judge finds that the assault in the stairwell did not occur. Any objections related to that section are, therefore, moot, as is Blount's "motion to incorporate affidavit," through which he seeks to demonstrate that correctional officers often assault inmates. Likewise, given the court's extensive review of the witnesses' testimony with respect to this claim, the court finds it unnecessary to address Blount's objections to the magistrate judge's recitation of the testimony.

The court also notes that, given the de minimis nature of Blount's injuries, Grear and Sutherland are entitled to judgment with respect to Blount's claim that they failed to protect him from Fleming and Vanover. See Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (setting forth the standard for analyzing conditions of confinement claims).

[5]The common fare diet meets kosher standards. See Acoolla v. Angelone, 2006 U.S. Dist. LEXIS 62574 at *12 (W.D. Va., Sept. 1, 2006).

11

"does not require the diet." (Docket No. 4, Ex. No. 8). In 2005, Blount filed a subsequent application to receive the common fare diet. Although the prison officials at Red Onion again recommended granting Blount's request, the Religious Diet Committee deferred the application for a period of six months. As previously noted, Blount did not amend his complaint to include any claims related to the deferment of his subsequent application, and in any event, failed to establish that he exhausted his administrative remedies with respect to such claims. Thus, the magistrate judge only addressed the substantive merits of his free exercise claims pertaining to the denial of his initial application.

The Free Exercise Clause of the First Amendment prohibits the adoption of laws designed to suppress religious beliefs or practices. See Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001). "[The First Amendment's] protections, including its directive that no law shall prohibit the free exercise of religion, extend to the prison environment." Id. (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Ali v. Dixon, 912 F.2d 86, 88-89 (4th Cir. 1990)). It is well established that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas v. Review Bd. Ind. Empl. Sec. Div., 450 U.S. 707, 714 (1981). Instead, the First Amendment protects sincere, but personal, religious beliefs, regardless of whether they are mandated by an established religion or held by a majority of a religion's followers. Id. at 715-716. The United States Supreme Court has recognized that differing beliefs and practices are "not uncommon among followers of a particular creed" and that the "guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." Id. at 715-716; see also Frazee v. Ill. Dep't of Employment Sec., 489 U.S. 829, 834 (1989) (rejecting "the notion that to claim the protection of the Free Exercise Clause, one must be

12

responding to the commands of a particular religious organization."); Dettmer v. Landon, 799 F.2d 929, 932 (4th Cir. 1986) (emphasizing that an inmate's "[r]eligious observances need not be uniform to merit the protection of the First Amendment."); Doswell v. Smith, 1998 U.S. App. LEXIS 4644 at *10-11 (4th Cir., March 13, 1998) (noting that the fact that an individuals's understanding of the origins or reasons for a particular religious practice may be mistaken or at odds with the understanding of other followers is "beside the point" when determining whether a particular belief is religious and sincere). Thus, if an inmate's religious beliefs are sincerely held, his beliefs and practices are entitled to consideration under the First Amendment, regardless of whether they are specifically required by the religious organization to which he belongs or shared by other followers of his religion.

An inmate's constitutional rights can be limited to achieve valid penological objectives. O'Lone, 482 U.S. at 348. When a prison official's decision infringes upon an inmate's First Amendment rights, the decision will nevertheless be upheld if it is "'reasonably related'" to promoting a legitimate penological interest. O'Lone, 482 U.S. at 349 (quoting Turner v. Safley, 482 U.S. 78, 87 (1987)). In order to make this determination, the court must consider four factors: (1) whether the disputed decision is logically connected to the legitimate government interest invoked to justify it; (2) whether the inmate has alternative means of exercising the right in question; (3) the impact that accommodation of the asserted right would have on other inmates, prison officials, and the allocation of prison resources; and (4) whether there is a ready alternative that would fully accommodate the inmate's rights. Id. at 350-353; Turner, 482 U.S. at 89-90.

RLUIPA prohibits governments from taking actions that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government

13

demonstrates that the imposition of that burden furthers a "compelling government interest" by the "least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(a). In order to prevail on a claim under this statute, a plaintiff must first demonstrate that the challenged practice or decision places a substantial burden on his exercise of sincere religious beliefs. 42 U.S.C. § 2000cc-2(b). If the plaintiff carries this burden, the government must then prove that the practice or decision furthers a compelling interest by the least restrictive means. Id.

During the evidentiary hearing, Blount testified that he has been a member of the House of Yahweh since June of 2003, and that the laws of the House of Yahweh require a kosher diet. (4/7/06 Tr. at 159). Blount produced evidence indicating that from August 25, 2003 to December 29, 2004, he made contributions to the House of Yahweh totaling $34.23. Blount also testified that Red Onion does not offer any religious programs, activities, or observances that are compatible with the House of Yahweh. (Tr. at 174).

Duncan Mills testified that he was the chairman of the Religious Diet Committee at the time that Blount initially applied for the common fare diet. (5/11/2006 Tr. at 232). Mills testified that he believed that Blount's application was the first from an inmate who claimed to belong to the House of Yahweh. (Tr. at 237). Although Mills stated that Blount's history of institutional infractions caused him to doubt the sincerity of Blount's religious beliefs (Tr. at 239), Mills affirmed that the "sole reason" for denying Blount's initial application for the common fare diet was the fact that the House of Yahweh was not recognized by the Department of Corrections as a religion requiring a special diet. (Tr. at 246). Mills later reemphasized on cross-examination that Blount's initial

14

application was denied because the House of Yahweh was not on the Department of Corrections' "approved list." (Tr. at 275). Mills acknowledged that in September or October of 2004, after Blount's initial request was denied, the Department of Corrections decided to add the House of Yahweh to the list of religions approved to receive the common fare diet. (Tr. at 235, 245). However, Mills testified that, pursuant to departmental policy at the time of Blount's initial application, the only reason that the Religious Diet Committee needed to deny a request was the fact that an applicant's stated religion had not been approved to receive the diet. (Tr. at 239, 245).

Based on the aforementioned evidence, the magistrate judge found that Blount stated a violation of his rights under the First Amendment and RLUIPA. Specifically, the magistrate judge found that Blount established that he has a sincerely held belief in the precepts of the House of Yahweh. The magistrate judge also found that Blount's ability to exercise his religious beliefs was substantially burdened by the denial of his initial application for the common fare diet. However, the magistrate judge determined that a reasonable official in Mills' position would not have known that denying Blount's request for the common fare diet, based on the fact that the House of Yahweh was not on the Department of Corrections' list of religions approved to receive the diet, violated clearly established law under RLUIPA or the First Amendment. Thus, the magistrate judge concluded that Mills is entitled to qualified immunity with respect to both claims filed against him in his individual capacity. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

Both Mills and Blount have filed objections to the Magistrate Judge's Report and Recommendation with respect to Blount's common fare diet claims. Mills objects to the magistrate judge's finding that Blount established a sincerely held belief in the House of Yahweh.[6] Mills argues that the magistrate judge erred by failing to consider evidence presented at the hearing pertaining to Blount's disciplinary history, his delayed recognition of a need for the common fare diet, and his refusal to declare his religious affiliation. For his objection, Blount argues that the magistrate judge erred in finding that Mills is entitled to qualified immunity. Relying on the Supreme Court's decisions in Thomas and Frazee, supra, Blount argues that an individual's sincerely held religious beliefs are entitled to protection regardless of whether those beliefs are mandated by a particular religion. Thus, Blount contends that Mills violated clearly established law by denying his initial application for the common fare diet solely on the basis that the House of Yahweh was not recognized by the Department of Corrections as a religion requiring the diet.

Having reviewed the record, the court agrees with Mills that the magistrate judge's factual findings with regard to the sincerity of Blount's beliefs are insufficient. Specifically, the magistrate judge did not provide any basis for discounting the defendant's evidence suggesting that Blount's religious beliefs are not sincerely held. Accordingly, the court finds it necessary to receive supplemental argument as to this finding.

However, assuming that Blount can prove the sincerity of his religious beliefs, the court agrees with Blount that Mills is not entitled to qualified immunity. The assertion of qualified immunity by a defendant requires the consideration of two questions. The first is whether the facts

---

[6]Mills does not object to the magistrate judge's finding that the decision to deny Blount's application for the common fare diet substantially burdened Blount's ability to freely exercise his religion.

16

alleged show the official's conduct violated a statutory or constitutional right. Saucier v. Katz, 533 U.S. 194, 202 (2001). If so, the court must determine whether the right was clearly established at the time of the alleged violation. Id. In answering the second question, the relevant inquiry is whether "it would be clear to an objectively reasonable officer that his conduct violated [the] right." Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002).

In this case, the magistrate judge determined that Blount alleged a violation of his rights under the Free Exercise Clause of the First Amendment and RLUIPA. However, the magistrate judge found that a reasonable official in Mills' position would not have known that he was violating clearly established law. To the contrary, the magistrate judge concluded that "predicating the common fare diet upon a showing that the diet is required by a particular religion is consistent with clearly established law." (emphasis added). In reaching this conclusion, the magistrate judge emphasized that, "although not specifically argued by Mills," it was not unreasonable for him to believe that denying an inmate's request to be placed on the common fare diet, based on the fact that the inmate's religion was not on the list of approved religions, was the least restrictive means of furthering the compelling interests of maintaining order and security and conserving prison resources.[7] Additionally, the magistrate judge noted that she was "unable to locate any case law to support a conclusion that such an outright determination by the DOC that a particular religion is eligible or ineligible to receive the common fare diet is improper." For the following reasons, the court disagrees.

---

[7]Because the magistrate judge determined that Mills' conduct was not in violation of clearly established law under RLUIPA's strict scrutiny standard, the magistrate judge found that it was a "foregone conclusion that [Mills'] conduct did not violate the First Amendment's reasonableness standard."

17

First, contrary to the magistrate judge's assertion, basing the decision to grant a request for the common fare diet upon a showing that the diet is required by a particular religion is not "consistent" with clearly established law under the First Amendment or RLUIPA. Instead, it is well-settled that an inmate's sincere, but personal, religious beliefs are entitled to constitutional and statutory consideration, regardless of whether they are "shared by all of the members of a religious sect," Thomas, 450 U.S. at 715-716, or "compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(a); see also Frazee, 489 U.S. at 834; Dettmer, 799 F.2d at 932. In this case, there is no indication that Blount's asserted belief that he must observe kosher dietary laws was afforded the degree of individualized consideration that is required by well-settled law. Rather, Mills explicitly testified that the "sole reason" for denying Blount's initial application for the common fare diet was the fact that the House of Yahweh was not on the list of religions approved to receive the diet. (5/11/2006 Tr. at 246, 275).

Moreover, while the magistrate judge cites several compelling penological interests in her report, including maintaining order and security and conserving prison resources, there is no evidence that Mills relied upon these interests in denying Blount's initial application. To the contrary, Mills did not identify any penological justifications for denying access to the common fare diet, which is otherwise widely provided,[8] to those inmates whose religions are absent from an approved list. Without such support in the record, the court cannot find that Mills' decision to deny Blount's initial application, on the basis that the House of Yahweh was not on the list of approved religions, furthered a compelling penological interest for purposes of RLUIPA or was reasonably

---

[8] Mills acknowledged at the evidentiary hearing that "a large number of prisoners at Red Onion ... participate in the diet." (5/11/2006 Tr. at 249).

18

related to a legitimate penological interest for purposes of O'Lone, 482 U.S. at 349 and Turner, 482 U.S. at 87.[9]

Thus, assuming that Blount's religious beliefs were sincerely held at the time he initially applied for the diet, Blount has established a violation of his rights under RLUIPA and the First Amendment. Because it was clearly established at the time of the alleged violation that prison officials may not substantially burden an inmate's right to exercise his personal religious beliefs without some legitimate penological justification, and because the court cannot conclude as a matter of law that it was objectively reasonable for Mills to believe that Blount's initial application was lawfully denied, Mills is not entitled to qualified immunity with respect to either claim. Thus, the court will sustain Blount's objection to this portion of the magistrate judge's report.

## Conclusion

For the reasons stated, the court adopts the following findings of fact and conclusions of law proposed by the magistrate judge: (1) Blount has exhausted his administrative remedies with regard to his excessive force claim; (2) Blount has exhausted his administrative remedies with regard to his freedom of religion claims arising from the denial of his initial application for the common fare diet; (3) Blount has failed to exhaust his administrative remedies with regard to any freedom of religion

---

[9] In his response to the Magistrate Judge's Report and Recommendation, Mills argues that "[c]orrectional officials have a compelling interest in preserving institutional order and security," and that this interest is "defeated" when an inmate who demonstrates violent behavior and disobeys institutional rules is nevertheless rewarded with a requested religious accommodation. However, Mills' argument ignores the fact that Blount's initial application for the common fare diet was denied solely on the basis that his religion was not on an approved list, and there is no evidence that this decision was motivated by the goal of preserving prison order and security. Thus, even though preserving order and security "is a legitimate, indeed compelling, penological interest," Morrison, 239 F.3d at 660, the court finds it unnecessary to consider in this case whether prison officials can lawfully attempt to control undesirable inmate behavior by denying participation in otherwise permissible, and protected, religious exercises.

19

claims arising from the deferment of his subsequent application for the common fare diet; (4) The injuries that Blount suffered on May 5, 2004 were, at most, de minimis; and (5) Mills is not subject to liability for monetary damages in his official capacity. Accordingly, the court will dismiss, without prejudice, any claims related to Blount's subsequent request for the common fare diet. The court will grant judgment in favor of the defendants as to Blount's excessive force claim against Fleming and Vanover; Blount's failure to protect claim against Grear and Sutherland; and Blount's official capacity claims against Mills.

As to the denial of Blount's initial application for the common fare diet, the court adopts the magistrate judge's finding that the decision substantially burdened Blount's ability to freely exercise his religion. However, the court rejects the magistrate judge's conclusion that Mills is entitled to qualified immunity for the free exercise claims filed against him in his individual capacity. The court will reserve ruling on Mills' objection to the finding that Blount established a sincerely held belief in the precepts of the House of Yahweh.

The Clerk is directed to set this matter for a hearing on the remaining objection. The Clerk is further directed to send a certified copy of this opinion and the accompanying order to the plaintiff.

ENTER: This 15th day of December, 2006.

_/s/ Jackson L. Kiser_
United States District Judge

20

Case 7:04-cv-00429-JCT-PMS   Document 142   Filed 12/18/06   Page 20 of 20   Pageid#: 1352