CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
MAY 30 2007
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DONNELL J. BLOUNT, SR.,<br>Plaintiff, | )<br>) Civil Action No. 7:04-cv-00429<br>) |
| v. | ) FINDINGS OF FACT AND<br>) CONCLUSIONS OF LAW<br>) |
| GENE M. JOHNSON, et al.,<br>Defendant(s). | ) By: Hon. James C. Turk<br>) Senior United States District Judge |

## I. INTRODUCTION

Plaintiff Donnell J. Blount, Sr., a Virginia inmate in the custody of the Virginia Department of Corrections ("VDOC") and proceeding pro se, brought this action under the Civil Rights Act, 42 U.S.C. §1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, with jurisdiction vested under 28 U.S.C. § 1343 and § 1331, respectively. Many claims have already been adjudged or dismissed. The court must now enter judgment on Blount's claim that Defendant Duncan Mills deprived him of his right to free exercise of his religious dietary beliefs by denying his April 2004 request for the Common Fare Diet in violation of RLUIPA and/or the Free Exercise Clause of the First Amendment, a claim prosecuted under § 1983. Only two issues relevant to this judgment remain to be decided: (1) whether Blount had and continues to have a sincere, religious belief that he should practice a kosher diet and (2) if so, the appropriate relief to which he is entitled. The court conducted a hearing on these issues March 14, 2007, heard testimony and argument from both parties, and reviewed the extensive record already developed in the case. For the reasons stated, the court now enters judgment for the plaintiff and grants him nominal damages

1

and costs. Pursuant to FED. R. CIV. P. 52(a), the court will set forth its findings of fact and conclusions of law.

## II. BACKGROUND

### A. THE EVIDENCE

The court finds it appropriate here to summarize the evidence from the record, the hearing conducted by the magistrate judge on April 7 and May 11, 2006, and the March 14, 2007 hearing. Blount's family is Christian, and before his incarceration in 2001, he too practiced Christianity. Then, someone gave him some literature on the House of Yahweh. As he read and learned about this new religion, he compared its precepts to those of Christianity and grew to believe that House of Yahweh more closely followed Biblical principles. He felt that Christianity had adopted many non-religious, non-Biblical rites, such as Christmas, Easter, and birthday celebrations. In June 2003, he decided to follow the House of Yahweh. From August 2003 to December 2004, he made contributions of more than $34 from his small prison income to the House of Yahweh organization in Texas. He also received monthly religious literature and prayed, according to his new beliefs. At some point, he became convinced that in keeping with his new faith's interpretation of Old Testament principles, he should eat a kosher diet. He tried to follow his new dietary beliefs by eating a vegetarian diet, but the high concentration of beans in that diet bothered his stomach. He was also unable to follow his beliefs by eating selected items from the regular VDOC menu; he could not get enough food that way, since the meats were not prepared according to his beliefs, and food trays were contaminated by contact with meats forbidden by his beliefs.

Case 7:04-cv-00429-JCT-PMS   Document 184   Filed 05/30/07   Page 2 of 18   Pageid#: 1435

On April 18, 2004, after his transfer to Red Onion State Prison, Blount asked to be placed on the Common Fare Diet ("CF Diet").[1] In answer to the application question, "Why do you want to be considered to participate in the Common Fare Diet?" he answered,

> The dietary laws set forth in the book of Yahweh--The Holy Scriptures command me to only eat Kosher meats, to keep Yahweh's yearly feast eating unleavened bread at the appointed feast, and only eat animals that are labeled as clean in the Holy Scriptures.

He stated his religious preference as "House of Yahweh" and indicated that he had been a member since June 2003. He also stated that the 613 laws of Yahweh and other literature he possessed would "explain and verify" his need for the diet.

The Internal Classification Authority ("ICA") at Red Onion approved Blount to receive the diet on May 11, 2004. The Central Classification Services ("CCS") in Richmond, however, disapproved Blount's application on June 2, 2004. The evidence establishes that at the time that the ICA and the CCS made their respective decisions on Blount's CF Diet Application, neither group evaluated whether Blount, personally, held a sincere, religious belief that he should follow a kosher diet. The ICA approved his for the diet request because its members were not familiar with House of Yahweh and were more comfortable allowing the CCS to make the final determination. The CCS disapproved Blount's application because at that time, House of Yahweh was not a religion recognized by the VDOC to receive the CF Diet. Mills testified that Blount's request for the diet was the first request the CCS had received from a House of Yahweh adherent, and the CCS members

---

[1]The court notes that the CF Diet is designed to comport generally with the dietary restrictions of several world religions, include Judaism and the Nation of Islam; many inmates at Red Onion and other state prisons are approved to receive the CF Diet for religious reasons.

had not yet researched what this religion required.² In September 2004, the VDOC added House of Yahweh to the list of religions approved to receive the diet. Blount made a second request for the CF Diet in September 2005. The ICA approved this request, but the CCS disapproved it because of his disciplinary record.

On March 14, 2007, the court heard arguments and testimony on the issue of whether Blount had a sincere, religious belief that he should keep kosher. Mills questioned why Blount had not requested the CF Diet earlier, during 2003 and early 2004, while he was at Sussex II State Prison or between September 2004 and September 2005, after the House of Yahweh was recognized as requiring the diet. Mills presented evidence that Blount had been charged and convicted for many disciplinary infractions. Mills entered into evidence a book about the House of Yahweh called The Peaceful Solution by Yisrayl Hawkins, interpreting "Yahweh's 613 laws of peace for all nations." If he had evaluated Blount's personal sincerity in June 2004, Mills said, he would have disapproved the application because Blount's many disciplinary infractions proved that he was not a religious person.³ Under VDOC policy in 2004, once an inmate was approved to receive the CF Diet, his

---

²Mills testified that the CCS did not make the list of VDOC inmate religions that were approved to receive the CF Diet and had no discretion, as a committee, to expand that list. He also testified, however, that the CCS members could make recommendations that a religion be added to the VDOC list if they received information from an inmate indicating that such an addition was warranted.

³Members of the ICA, who worked at the institution, did not find that Blount's disciplinary convictions prevented them from approving him to receive the CF Diet in April 2004 or in September 2005.

4

subsequent conviction for a disciplinary infraction would not cause him to be disapproved for the diet.[4]

Blount testified that he had a copy of the 613 laws of the House of Yahweh, but did not have a copy of Hawkins' book and had not read it. He testified that he is still learning about the 613 laws and their meanings and has not fully accepted or sought to practice all of them, although he believes and tries to practice many of them. Specifically, Blount professes a sincere belief in two particular House of Yahweh tenets: the restrictions on diet and the Nazarite vow, which among other things, prohibits drinking grape juice and shaving or cutting one's hair. He accepts the House of Yahweh interpretation that Jesus was the "Passover sacrifice" who did away with the death penalty for sin, but did not abolish other Mosaic laws found in the Old Testament of the Bible, such as the dietary laws of Moses. Blount does not eat pork or filtering seafood and believes that blood should be removed from meats before it is eaten. When he is forced to eat foods that do not comport with his beliefs, he believes he is sinning against Yahweh and is cut off from heaven. He asserted that many of the disciplinary convictions listed in Mills' evidence had been expunged or were not his convictions and that many of the disciplinary charges brought against him were fabricated. He argued that his practice of all House of Yahweh tenets does not have to be perfect in order for his belief in the dietary requirements to be sincere.

Blount testified that as relief in this action, he seeks to receive the CF Diet and to recover monetary damages and costs. He testified that he paid $53.60 for photocopies of documents and transcript pages in this case. The record also indicates that he consented to pay a $150.00 filing fee

---

[4]Mills indicated to the court, however, that VDOC officials have recently changed that policy so that an inmate's disciplinary conviction after approval for the CF Diet will cause his removal from the diet.

for this action through installments payments from his inmate account, that he has paid a good portion of that fee already, and that the remainder will be collected from his inmate account as it becomes available in his account. On May 17, 2007, the CCS approved Blount's application for placement on the CF Diet once he had demonstrated charge-free conduct for six months.

## B. PROCEDURAL HISTORY

Blount's original complaint raised five groups of claims. The Honorable Glen E. Conrad, United States District Judge, to whom the case was originally assigned, summarily dismissed two groups of claims, and Blount voluntarily dismissed a third group of claims before the case was served. After litigation on the issue of exhaustion of administrative remedies, defendants moved for summary judgment on the remaining claims, which alleged excessive force and denial of religious dietary accommodations. By opinion and order issued March 2, 2006, Judge Conrad denied defendants' motion. Pursuant to referral under 28 U.S.C. § 636(b)(1)(B), United States Magistrate Judge Pamela Meade Sargent conducted an evidentiary hearing on April 7, 2006 and May 11, 2006. She issued a Report and Recommendation on June 29, 2006, recommending judgment for the defendants.[5] Both sides filed objections. Judge Conrad, by opinion and order entered December 18, 2006, adopted the Report and Recommendation in part, granted judgment for the defendants on the excessive force claim, and dismissed without prejudice Blount's claim that defendants denied his second request for the CF Diet in the fall of 2005, as the court found that Blount had not exhausted his administrative remedies as to that claim.

Blount's remaining claims alleged that Defendant Duncan Mills violated his rights under the First Amendment and RLUIPA by denying his initial application in April 2004 to be placed on the

---

[5]Neither party had requested a jury trial.

6

CF Diet.[6] The magistrate judge made findings of fact that Blount had a sincerely held, religious belief in the House of Yahweh, based on his contributions to the religious organization and the religious literature he produced, and that the VDOC policy of denying an inmate's request to receive CF Diet, based on its determination that the inmate's professed religion is not eligible to receive that diet, substantially burdened Blount's ability to exercise his religious beliefs freely. She noted that prison officials have compelling penological interests in maintaining order and security and in managing limited prison resources and that Mills reasonably could have believed that restricting the CF Diet to inmates belonging to a religion requiring the diet furthered those interests. Accordingly, she found that a reasonable official in Mills' position would not have known denial of the diet under the VDOC's policy violated Blount's clearly established rights under the First Amendment or under RLUIPA and recommended granting judgment for Mills on the ground of qualified immunity.

Mills objected to the Report, arguing that the magistrate judge offered insufficient support for her factual finding that Blount had a sincere religious belief. Blount objected to the finding of qualified immunity. Judge Conrad agreed that the factual findings on Blount's sincerity were insufficient and withheld judgment on that issue. However, Judge Conrad sustained Blount's objection to the finding that Mills enjoyed qualified immunity against claims for damages. In so doing, he also found that if Blount had a sincere, personal religious belief in April 2004 that he should practice a kosher diet, Mills' actions in denying the diet in the manner that he did violated Blount's constitutional and statutory rights. The judge then ordered that the matter be set for a hearing.

---

[6] Because Blount had a separate claim concerning denial of his second application for the diet in September 2005, defendants' potential liability for damages for denial of his initial diet application extends, at most, from April 2004 to September 2005.

7

On January 23, 2007, Judge Conrad found it necessary to disqualify himself from further participation in the case, which then was transferred to the docket of the undersigned. The court heard testimony and argument from the parties in a hearing conducted on March 14, 2007. Blount testified further about his religious beliefs, and both parties submitted additional exhibits. At the close of the hearing, over Mills' objection, the court allowed Blount to amend his complaint to add a claim for injunctive relief, as he wished to obtain a court order that he be placed on the CF Diet. The court also encouraged the parties to negotiate a settlement. Both parties later informed the court, however, that settlement is impossible. On May 21, 2007, Mills moved to expand the record to add evidence that on May 17, the VDOC Common Fare Diet Review Committee had administratively approved Blount's latest request for the CF Diet, after he had successfully completed six months without any chargeable conduct. The court will grant this motion.

### III. STATEMENT OF APPLICABLE LAW

A prisoner has a clearly established right under both the Free Exercise Clause of the First Amendment and RLUIPA to receive a diet consistent with his sincerely held religious scruples. Lovelace v. Lee, 472 F.3d 174, 198 (4th Cir. 2006) (internal quotations and citations omitted); Ross v. Blackledge, 477 F.2d 616, 618-19 (4th Cir. 1973) (free exercise clause).

## A. First Amendment Standard

Inmates unquestionably retain protections under the First Amendment, including the right to free exercise of religious beliefs.[7] Cruz v. Beto, 405 U.S. 319, 322 (1972). In deference to the expertise of prison administrators in managing the difficult challenges of incarceration, however, even a prison policy that substantially burdens an inmate's ability to practice his religious beliefs withstands a First Amendment challenge so long as it is rationally related to a legitimate governmental interest. Turner v. Safley, 482 U.S. 78, 89-81 (1987); O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987).[8] A "substantial burden" is one that "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 718 (1981).

## B. Religious Land Use and Institutionalized Persons Act

RLUIPA prohibits governments from taking actions that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that imposition of that burden furthers "a compelling governmental interest" by "the least restrictive means." § 2000cc-1(a)(1)-(2). Plaintiff bears the burden of proving that the

---

[7]As stated, Blount brought his First Amendment claim under § 1983. Under §1983, a plaintiff must establish that he has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42 (1988).

[8]Under Turner, the court must consider four factors in addressing an inmate's constitutional claim: (1) whether there is a "valid, rational connection" between the regulation and a legitimate and neutral governmental interest; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (c) whether the extent to which accommodation of the asserted right will have an impact on prison staff, on inmates' liberty and on the allocation of limited prison resources; and (d) whether the regulation represents an "exaggerated response" to prison concerns. Id. at 89-91.

9

challenged prison practice or lack of religious accommodation places a substantial burden on his exercise of sincere, religious beliefs. § 2000cc-2(b). Once plaintiff carries this burden, the government must prove that the imposition of the burden (or refusal to accommodate plaintiff's belief) furthers a compelling interest by the least restrictive means. Id. RLUIPA does not define "substantial burden." The United States Court of Appeals for the Fourth Circuit has held that for purposes of RLUIPA, "a substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Lovelace, 472 F.3d at 187 (quoting Thomas, 450 U.S. at 718).

### C. SINCERE, RELIGIOUS BELIEF

Only personal practices that are both sincerely held and rooted in religious belief fall under the protections of the Free Exercise Clause or RLUIPA. Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972); Cutter v. Wilkinson, 544 U.S. 709, 725 n. 13 (2005) (noting that under RLUIPA, "prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic" and whether his "professed religiosity" is "sincere"). Therefore, the court must, as a threshold matter, determine whether the inmate's belief is both sincere and religious. To warrant protection under the constitution and RLUIPA, the belief need not be mandated by a particular, established religion or held by a majority of the believers within a religion. Thomas, 450 U.S. at 716 (finding that federal courts are not to sit as arbiters of religious orthodoxy); 42 U.S.C. § 2000cc-5(7)(A) (defining "religious exercise" as including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief"). Moreover, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas, 450 U.S. at 714. Thus, in deciding if a particular

10

Case 7:04-cv-00429-JCT-PMS   Document 184   Filed 05/30/07   Page 10 of 18   Pageid#: 1443

inmate's dietary practice is protected, the court may not measure the "truth" of an inmate's stated religious belief or test its accuracy by comparison to the tenets of any established religion. United States v. Seeger, 380 U.S. 163, 185 (1965). The fact that an individual's understanding of the origins or reasons for a particular religious practice may be mistaken, incomplete, or at odds with the understanding of other followers and even experts of his stated religion is "beside the point" when determining whether his personal belief is religious and sincere. Doswell v. Smith, 139 F.3d 888, *3, No. 94-6780, 1998 WL 110161 (4th Cir. 1998) (unpublished) (citing Thomas, 450 U.S. at 715-16).

In keeping with this line of reasoning, an inmate may decide not to be religious about one practice and still be religious about other practices of an established religion. Lovelace, 472 F.3d at 188. Consequently, neither the court nor prison officials may automatically assume "that lack of sincerity (or religiosity) with respect to one practice of a given religion means lack of sincerity with respect to others." Lovelace, 472 F.3d at 188; ; Dettmer v. Landon, 799 F.2d 929, 932 (4th Cir. 1986) (emphasizing that an inmate's "[r]eligious observances need not be uniform to merit the protection of the First Amendment"); Reed v. Faulker, 842 F.2d 960, 963 (7th Cir. 1988) (recognizing "the fact that a person [who] does not adhere steadfastly to every tenet of his faith" may still be sincere about participating in some religious practices). On the other hand, sincerely held, but secular individual preferences, such as a personal dislike of certain meats or methods of food preparation, are not protected by the Free Exercise Clause. Doswell, 139 F.3d 188 at*4. "Evidence of nonobservance is relevant on the question of sincerity," but is not "conclusive of insincerity." Reed, 842 F.2d at 963 (recognizing that "an inmate may adopt a religion merely to harass the prison staff with demands to accommodate his new faith"). Clearly, distinguishing

11

between religious and secular beliefs, sincere or insincere, is difficult. See, e.g., Frazee v. Illinois Employment Security Dept., 489 U.S. 829, 833 (1989) (recognizing "the difficulty of distinguishing between religious and secular convictions and in determining whether a professed belief is sincerely held"). Nevertheless, that is the liability question left for the court to answer in this case: whether Blount's asserted belief that he should observe kosher dietary laws was a belief "sincerely held and . . . in [his] own scheme of things, religious." United States v. Seeger, 380 U.S. 163, 185 (1965).

### D. QUALIFIED IMMUNITY

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The qualified immunity analysis has three parts: (1) did defendant's conduct violate plaintiff's rights? (2) were the contours of plaintiff's rights clearly established at the time of the conduct? and (3) would an objectively reasonable officer in the same situation have known that his conduct violated the right? Saucier v. Katz, 533 U.S. 194, 202 (2001).

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

As supplemented by the foregoing summary of the evidence and applicable law, the court now states its findings of fact and conclusions of law:

1. The court now finds and concludes that in April and June 2004, Blount had a sincere, religious belief that continues to this day that he, according to his understanding of the House of Yahweh religion, should eat a kosher diet.

The magistrate judge and Judge Conrad both found that Mills denied Blount's April 2004 request for the CF Diet only because House of Yahweh was not on the VDOC's list of religions approved to receive the diet and that neither Mills nor the officials at Red Onion made any particularized inquiry into the nature of Blount's personal beliefs. Nevertheless, a decision on Blount's sincerity and religiosity is necessary in this case. Unless Blount's newly identified need to keep kosher in April 2004 was grounded in his sincere, personal religious belief, he had no constitutional or statutory right to accommodation of his dietary needs. Yoder, 406 U.S. at 215-16.

Mills pointed to several facts in the record in arguing that Blount's desire for the CF Diet was not based in any sincere, religious belief: (a) Blount's delay in requesting the diet for several months after his "conversion" to House of Yahweh beliefs, (b) Blount's delay in reapplying for the diet after House of Yahweh was approved for the diet; and (c) Blount's many disciplinary convictions for disrespectful and assaultive behavior.

The court finds Blount's countering testimony to be persuasive. First, he asked for the CF Diet when, in the course of learning about his new religion, he developed a sincere belief that he would be sinning against Yahweh if he did not do so. He has also explained the Biblical basis for his dietary beliefs.

Second, the record suggests no reason other than sincere, religious belief for Blount to request a kosher diet. In giving up such food items as pork and milk, for example, Blount deprived himself of foods he loved. In requesting the CF Diet, a menu choice already available for VDOC inmates who qualify, he was not "harassing" officials with outlandish demands for special treatment or exotic foods.

13

Third, Blount's delay in making his second request for the diet does not contradict other evidence of sincerity and religiosity: his contributions, prayers, and study of religious literature from House of Yahweh. Nor does the record reflect that Blount delayed his second request until September 2005 because his religious belief waned after his initial request in April 2004. After all, on or about July 22, 2004, after the CCS denied his first request for the diet, Blount filed this lawsuit as his means of seeking accommodation of his dietary beliefs, consented to pay a $150.00 filing fee for the suit, and thereafter, vigorously prosecuted it.

Finally, even if his disciplinary record of assaultive offenses is at odds with other teachings of his stated religion, this fact does not automatically prove any lack of sincerity or religiosity in his belief in keeping kosher. Lovelace, 472 F.3d at 188. Blount may choose to follow some and not other tenets of his chosen religion. Id. Mills does not demonstrate that any of Blount's disciplinary infractions specifically exhibited disrespect for, or were inconsistent with, Blount's stated dietary principles. Officials at Red Onion, who were in a better position than anyone to evaluate Blount's behavior, did not express any belief that his disciplinary infractions disproved his sincerity in his religious belief that he should eat a kosher diet. Moreover, the court accepts Blount's explanation that he is still learning the precepts of his faith and deciding which ones he sincerely believes and intends to practice. Blount also makes a persuasive argument that his failure to follow all tenets of his religion at all times does not prove lack of sincerity in his belief in those tenets; it proves, at most, that he is an imperfect human being. In this failing, he is clearly not alone.

For these reasons, the court finds and concludes that Blount's belief that he should practice a kosher diet in April 2004, according to his own understanding of House of Yahweh teachings, was both "sincerely held and . . . in [his] own scheme of things, religious." Seeger, 380 U.S. at 185.

Therefore, his religious dietary practice was entitled to protection under the Free Exercise Clause and RLUIPA.

2. The court finds and concludes, as did Judge Conrad, that Mills, by denying Blount's June 2004 application to receive the CF Diet in the manner that he did and thus depriving him of the diet for several months, violated Blount's rights under RLUIPA and the Free Exercise Clause. Specifically, Judge Conrad found that it was clearly established in April 2004 that "an inmate's sincere, but <u>personal</u>, religious beliefs are entitled to constitutional and statutory consideration, regardless of whether they are shared by all members of a religious sect or compelled by, or central to, a system of religious belief." Mem. Op., Dec. 18, 2006, at 18 (emphasis added and internal quotations and citations omitted) (citing 42 U.S.C. § 2000cc-5(7)(a); <u>Thomas</u>, 450 U.S. at 715-16; <u>Frazee</u>, 489 U.S. at 834; <u>Dettmer v. Landon</u>, 799 F.2d 929, 932 (4th Cir. 1986)). Judge Conrad found

> no indication that Blount's asserted belief that he must observe kosher dietary laws was afforded the degree of individualized consideration that is required by well-settled law. Rather, Mills explicitly testified that the "sole reason" for denying Blount's initial application for the common fare diet was the fact that the House of Yahweh was not on the list of religions approved to receive the diet.
> Moreover, while the magistrate judge cites several compelling penological interests in her report, including maintaining order and security and conserving prison resources, there is no evidence that Mills relied upon these interests in denying Blount's initial application. To the contrary, Mills did not identify any penological justifications for denying access to the common fare diet, which is otherwise widely provided, to those inmates whose religions are absent from an approved list. Without such support in the record, the court cannot find that Mills' decision to deny Blount's initial application, on the basis that the House of Yahweh was not on the list of approved religions, furthered a compelling penological interest for purposes of RLUIPA or was reasonably related to a legitimate penological interest for purposes [of his First Amendment claim].

Mem. Op., Dec. 18, 2006, at 18-19. Based on these findings, Judge Conrad held that "<u>assuming Blount's religious beliefs were sincerely held at the time he initially applied for the diet</u>, Blount has established a violation of his rights under RLUIPA and the First Amendment." Id. at 19 (emphasis added).

As the court has now determined that Blount had a sincere, religious belief that he should follow a kosher diet in April 2004, the court also finds and concludes that Mills' denial of the diet violated Blount's constitutional and statutory rights.

3. The court finds and concludes, as did Judge Conrad, that Defendant Mills' is not entitled to good faith, qualified immunity against Blount's claims for monetary damages. Judge Conrad held that

> [b]ecause it was clearly established at the time of the alleged violation that prison officials may not substantially burden an inmate's right to exercise his personal religious beliefs without some legitimate penological justification, and because the court cannot conclude as a matter of law that it was objectively reasonable for Mills to believe that Blount's initial application was lawfully denied, Mills is not entitled to qualified immunity as to either [the First Amendment claim or the RLUIPA] claim.

Mem. Op., Dec. 18, 2007, at 19.

4. The court finds and concludes that Blount's demand for injunctive relief, ordering that he be placed on the CF Diet, must be dismissed as moot, based on the fact that he was administratively approved by the CCS on May 17, 2007 to receive the diet. The court also commends Blount for remaining charge free for six months and advises him to continue this trend.

5. The court finds and concludes that Blount's demand for compensatory damages, other than nominal damages, must be denied, as he has not proven any compensable harm suffered as a result of being deprived of his religious diet. The abstract value or importance of constitutional rights is

16

not a permissible element of compensatory damages. Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 308 (1986). Any compensatory damages associated with an established violation of plaintiff's constitutional rights must be proved. Carey v. Piphus, 435 U.S. 247, 266-67 (1978); Burt v. Abel, 585 F.2d 613, 616 (4th Cir. 1978); Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974) ("all awards [of compensatory damages] must be supported by competent evidence concerning the injury"). To the extent that compensatory damages may be available under RLUIPA in a claim such as Blount's--against a prison official in his individual capacity,[9] such damages would also need to be proven with competent evidence. Plaintiff can recover nominal damages for the proven violation of his constitutional rights, however, even when he has not proven any other compensable injuries caused by the violation.[10] Carey, 435 U.S. at 266-67 (finding that plaintiff is entitled to nominal

---

[9] The Fourth Circuit in Lovelace determined that a prison official applying a policy in a manner that violated an inmate's rights under RLUIPA would qualify as a "government" so as to be subject to suit under the statute in his individual capacity. Lovelace, 472 F.3d at 194. The court left open, however, the question of whether a plaintiff may recover compensatory damages under RLUIPA against government officials for actions taken in their individual capacities. See Lovelace, 472 F.3d at 197 n.7 (citing cases indicating a split among courts that have mentioned the issue). Because Blount fails to prove any compensatory damages with the requisite specificity in this case, the court need not decide the underlying issue of whether such damages are available in a case where specific, compensable injury was proven. Moreover, as the court has determined that Blount is entitled to nominal damages under the First Amendment, an additional award of nominal damages for the same conduct under RLUIPA is not proper. See EEOC v. Waffle House Inc., 534 U.S. 279, 297 (2002) ("[I]t goes without saying that the courts can and should preclude double recovery by an individual") (internal quotations omitted).

[10] The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), provides that "[n]o Federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury." The court does not find this statute to bar an award of nominal damages, however. Indeed, the plain language of the statute indicates that it limits only recovery "for mental and emotional injury," leaving available claims for nominal or punitive damages which seek to remedy a different type of injury. See Calhoun v. DeTella, 319 F.3d 936, 941 (7th Cir. 2003) (citing other cases finding that § 1997e(e) does not bar all awards of monetary damages in prisoner civil rights actions where no physical injury is proven and recovery is sought for injuries other than mental or emotional injury); Rowe v. Shake, 196 F.3d 778, 781-82

17

damages for proven violation of constitutional rights). Accordingly, the court will award Blount nominal damages in the amount of $1.00. The court will also award costs in the amount of $203.60 to cover Blount's stated expenditures for photocopies and his $150.00 filing fee.

6.  The court finds and concludes that punitive damages are not warranted in this case and that Blount's demand for such relief should be denied. Punitive damages may be awarded upon a finding that the defendant showed "reckless or callous disregard for the prisoner plaintiff's rights" or intentionally violated his rights. Smith v. Wade, 461 U.S. 30, 51 (1983). Punitive damages, however, are "never awarded as of right, no matter how egregious the defendant's conduct." Id. The record does not reflect that Mills intended to violate Blount's constitutional or statutory rights in denying his initial request for the CF Diet. He erroneously believed that Blount had no right to the diet. Nor does the court find that Mills acted with "reckless or callous disregard" for Blount's rights. After all, within a few months, the House of Yahweh was approved for the diet, and Mills' testimony indicated a strong likelihood that if Blount had reapplied for the diet during the period when he was charge free, between July 2004 and March 2005, he would have been eligible to receive it.

The Clerk is directed to send copies of these findings of fact and conclusions of law and the accompanying final judgment order to plaintiff and to counsel of record for the defendant.

ENTER: This 30th day of May, 2007.

*James C. Turk*
Senior United States District Judge

---

(7th Cir.1999) (deprivation of a constitutional right is itself a cognizable injury, regardless of any resulting mental or emotional injury).